J-A01042-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| ZACHARY T. WILSON | |
| Appellant | No. 2314 EDA 2014 |

Appeal from the Judgment of Sentence April 1, 2014
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0929501-1986

BEFORE:  LAZARUS, J., OTT, J., and STEVENS, P.J.E.*

MEMORANDUM BY LAZARUS, J.:                    **FILED JUNE 03, 2016**

Zachary T. Wilson appeals from the judgment of sentence entered in the Court of Common Pleas of Philadelphia County after a jury convicted him of first-degree murder[1] and possession of an instrument of crime (PIC).[2] Upon careful review, we affirm.

This case arises out of the 1978 murder of Wilson's adopted brother, Ronnie Williams, also known as "Jock."[3]  Wilson believed that the victim in this case, Jamie Lamb, was responsible for Williams' death and, according to a witness named Michael Patterson, vowed that he would "get with Jamie,"

---

[1] 18 Pa.C.S.A. § 2502.

[2] 18 Pa.C.S.A. § 907.

[3] Williams is at times referred to as Wilson's cousin.

*Former Justice specially assigned to the Superior Court.

regardless of how long it took. The trial court set forth the facts of Lamb's murder as follows:

> On August 3, 1981, at approximately 1:00 p[.]m[.], Patterson went to Gainer's Tire Shop located at Fox Street and Lippincott Street in North Philadelphia. There, outside the shop, were [Wilson], Rodney Wells, and Ford Howard. While this group was together, Lamb, Kenny Mozelle, Jeffrey Rahming, "Peanut," [whose name was never revealed,] and Carl Rowland walked past. Lamb was heading to Sweet Joy Lounge, where his younger sister worked, at the corner of 24th Street and Allegheny Street in North Philadelphia. As he passed, Lamb smiled at [Wilson], who appeared angry in response. Shortly after Lamb left, [Wilson], Howard and Wells all left the Tire Shop, walking in the same direction that Lamb had gone. [Wilson] was wearing a dark "apple jack" style hat.
>
> Minutes later, Lamb was in the back of the Sweet Joy Lounge. [Wilson] entered the lounge, walked into the rear section, and shot Lamb five times. [Wilson] then attempted to flee the lounge, but tripped over Edward Jackson, one of the patrons who had fallen to the floor when the shooting started. Jackson was able to view [Wilson's] face before [Wilson] stood up and ran out of the building. Upon exiting, [Wilson] ran into a Cadillac, which sped away from the scene and failed to stop at a red light. Wells owned a Cadillac Eldorado at the time of the shooting.
>
> At approximately 1:15 p.m., Patterson saw Rowland running down the street, yelling "[c]ome on, y'all, come on, come on," and that "[t]he little short guy just killed Jamie, they just passed us down there by the car." Rowland further stated that "the little short guy" had just been with Howard and Wells.
>
> A few days after Lamb's death, Patterson was on the phone with [Wilson] when Patterson stated, "Turtle says you killed Jamie." [Wilson] replied that "Turtle needed to keep his name out of my mouth . . . before he get plucked."
>
> On March 31, 1982, Jackson attended a line-up and purposefully misidentified the shooter, selecting someone other than [Wilson]. Jackson did this because he had been visited by two men with a gun, approximately five months earlier, who told him to "mind [his] own business and don't say nothing to the cops

about nothing." Jackson informed homicide detectives that same day that he purposefully selected the wrong person.

Trial Court Opinion, 11/26/14, at 3-4 (footnotes and citations to the record omitted).

Wilson was originally tried and convicted of first-degree murder on January 7, 1988; he was sentenced to death. His judgment of sentence was affirmed by our Supreme Court; subsequent proceedings under the Post Conviction Relief Act likewise garnered him no relief. On June 6, 2005, Wilson filed a federal petition for writ of habeas corpus in which he alleged numerous *Brady*[4] violations by the prosecution. By order dated August 9, 2006, the U.S. District Court for the Eastern District of Pennsylvania granted relief and that order was affirmed by the U.S Court of Appeals for the Third Circuit. Wilson was retried in April 2013; this trial resulted in a hung jury.

The matter was reassigned to the Honorable Glenn B. Bronson and, on April 1, 2014, a jury again convicted Wilson of first-degree murder and PIC. Judge Bronson immediately imposed the mandatory sentence of life in prison for the murder conviction, with no further penalty on the PIC charge. The trial court denied Wilson's post-sentence motions on July 24, 2014.

_____

[4] *Brady v. Maryland*, 373 U.S. 83 (1963). In *Brady*, the U.S. Supreme Court "held that 'the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'" *Banks v. Dretke*, 540 U.S. 668, 691 (2004), quoting *Brady*, 373 U.S. at 87.

This timely appeal follows, in which Wilson raises the following issues for our review:

1. Did the [trial] court err in denying [Wilson's] pre-trial motions to bar re-prosecution on double jeopardy grounds or, alternately, to conduct a hearing on whether the prosecutor intentionally withheld *Brady* evidence?

2. Did the [trial] court err and violate [Wilson's] right to due process when it excluded defense witnesses who would have placed an inculpatory statement in proper context, thus challenging the [C]ommonwealth's theory that the statement showed consciousness of guilt?

3. Did the [trial] court err when it admitted Michael Patterson's testimony that "Turtle" told him that [Wilson] was the shooter, and other testimony suggesting that Turtle was an eyewitness? Did this error allow the Commonwealth to benefit from its earlier *Brady* violations? Did this error violate due process of law and the right to confrontation?

4. Did the [trial] court err when it [a]dmitted [p]rior [s]tatements of Edward Jackson that [i]mproperly [b]olstered [h]is [i]n-[c]ourt [t]estimony?

5. Did the [trial] court err and abuse its discretion when it admitted a portion of [Wilson's] 1988 penalty phase testimony? Did admission of this testimony also violate [Wilson's] right to due process of law, because it was the product of earlier *Brady* violations?

6. Did the trial court err when it denied motions, made during and after trial, for discovery of the medical reason(s) for the five-day delay of Edward Jackson's testimony?

Brief of Appellant, at 2.

Wilson first alleges that the trial court should have granted his motions to bar re-prosecution on double jeopardy grounds because the *Brady* violations by the Commonwealth during the course of his 1988 trial were intentional and done in order to deprive him of a fair trial. In the

alternative, Wilson argues that the trial court, minimally, should have held a hearing to determine whether the prosecutor in his 1988 trial intentionally withheld ***Brady*** evidence. Wilson is entitled to no relief.

In 2006, Wilson was granted federal habeas corpus relief on multiple ***Brady*** claims. Wilson alleged, and the federal court found, that the Commonwealth failed to provide him with exculpatory information which would have allowed his counsel to impeach the testimony of Edward Jackson, Jeffrey Rahming and Lawrence Gainer, key witnesses in the 1988 trial. Specifically, the federal court found that the Commonwealth failed to turn over: (1) evidence of Jackson's prior criminal history, including *crimen falsi* convictions and a psychiatric evaluation performed in conjunction with a pre-sentence investigation related to one of those convictions; (2) Rahming's psychiatric history; and (3) evidence relating to Gainer's status as a long-time informant for Philadelphia Police Officer John Fleming and the fact that Officer Fleming made interest-free loans to Gainer.

In declining to grant Wilson relief on double jeopardy grounds, the trial court reviewed the testimony of the prosecutor in Wilson's 1988 trial, Arlene Fisk, Esquire, at two PCRA hearings held before the Honorable John Poserina, Jr., in 1997 and 1998. The court concluded that Attorney Fisk's testimony "establishe[d] that she did not intentionally withhold information in order to provoke defendant into a mistrial or to subvert the truth-determining process and deny defendant a fair trial[.]" Trial Court Opinion, 11/26/14, at 6. Accordingly, the court found that Wilson was not entitled to

relief. Moreover, the court declined to grant Wilson a hearing on the matter, because Attorney Fisk testified extensively during the PCRA proceedings, at which time Wilson was represented by current counsel. The court noted that Attorney Fisk had little specific recollection of events at the time of the PCRA hearings and no purpose would have been served by holding additional hearings 16 years later on essentially the same issue.

The double jeopardy clause of the Pennsylvania Constitution prohibits retrial of a defendant when the conduct of the prosecutor is intentionally undertaken to prejudice the defendant to the point of denying him a fair trial. *Commonwealth v. Smith*, 615 A.2d 321 (Pa. 1992). However, because of the compelling societal interest in prosecuting criminal defendants to conclusion, our Supreme Court has recognized that dismissal of charges is an extreme sanction that should be imposed sparingly and only in cases of blatant prosecutorial misconduct. *Commonwealth v. Burke*, 781 A.2d 1136, 1144 (Pa. 2001). A mere finding of willful prosecutorial misconduct will not necessarily warrant dismissal of charges. *Id.* at 1145; *Commonwealth v. Moose*, 602 A.2d 1265 (Pa. 1992) (although prosecutor's failure to inform defense counsel of witness statement containing incriminating admissions allegedly made by defendant amounted to willful discovery violation and raised significant ethical concerns, court did not dismiss charges, but rather remanded for new trial).

Here, Attorney Fisk testified extensively at the hearings on Wilson's PCRA petition. Although the intentions of the prosecutor were not relevant

to the **Brady** claims before the court at the time, it is clear from the PCRA hearing transcripts that there is no reasonable probability that additional testimony from Attorney Fisk would support Wilson's claims.

Wilson first asserts that the prosecution intentionally withheld evidence regarding Edward Jackson's prior *crimen falsi* convictions. At the PCRA hearing, Wilson's counsel vigorously questioned Attorney Fisk about her standard practice regarding Commonwealth witnesses with *crimen falsi* convictions. The following exchange occurred between Wilson's counsel and Attorney Fisk:

> Q: Now, is your purpose in bringing out *crimen falsi* convictions under direct examination to blunt whatever impact they might have if you left them be and defense counsel brought them out on cross?
>
> A: Well, if I know about them and I know that they are admissible, I may as well disclose them.
>
> Q: So would it be fair to say then that if you do not bring it out on direct that there's a *crimen falsi* -- withdrawn. If you don't bring out any *crimen falsi* on direct, would we be correct in assuming that you did not disclose any *crimen falsi* to the defense?
>
> A: Well, it would be correct to assume that I was unaware of *crimen falsi*.

N.T. PCRA Hearing, 12/1/97, at 96. During the course of questioning by Wilson's counsel, Attorney Fisk had little independent recollection of the specifics of Jackson's criminal record, but repeatedly reiterated that, had she been aware of his prior *crimen falsi* convictions, she would have disclosed them. Similarly, she testified that she would have disclosed the information

contained in Jackson's prior pre-sentence investigation report regarding his "psychological need to want to assist police and to identify with police." ***Id.*** at 101. Counsel for Wilson strenuously and thoroughly examined Attorney Fisk regarding all aspects of her case preparation relating to the criminal backgrounds of Commonwealth witnesses; however, none of her responses raises even a suggestion that information was intentionally withheld from the defense. Even assuming that the prosecution was in possession of Jackson's *crimen falsi* history, there is nothing in the record to suggest that any failure to disclose the information was intentional rather than simply inadvert. In any event, information contained in a witness' criminal record is not within the Commonwealth's exclusive control and, thus, not ***Brady*** material. ***Commonwealth v. Spotz***, 896 A.2d 1191, 1248 (Pa. 2006) (no ***Brady*** violation occurs where parties had equal access to information or if defendant knew or could have uncovered such evidence with reasonable diligence).

Wilson also asserts that the prosecution intentionally suppressed evidence that: (1) a detective associated with the district attorney's office took Jeffrey Rahming to a psychiatric emergency room after his testimony at Wilson's trial while Rahming was in the midst of a psychotic breakdown; and (2) Lawrence Gainer received interest-free loans from Philadelphia Police Officer John Fleming. However, Wilson fails to develop these specific claims in his brief and, as such, they are waived. ***Commonwealth v. Akbar***, 91 A.3d 227, 235 (Pa. Super. 2014) (appellant waives issue on appeal if he fails

to present claim with citations to relevant authority or develop issue in meaningful fashion capable of review).

In his next claim, Wilson asserts that his due process rights were violated when the trial court excluded the testimony of defense witnesses who would have placed a seemingly inculpatory statement in proper context, thus countering the Commonwealth's theory that the statement demonstrated a consciousness of guilt. Specifically, Michael Patterson testified at trial that he had told Wilson that an individual named "Turtle" had said that Wilson had killed the victim. Patterson testified that Wilson responded: "Turtle need to keep his name out my mouth before he get plucked," or killed. The Commonwealth argued that Wilson's statement – a threat to kill "Turtle" if he did not stop accusing Wilson of the murder – manifested a consciousness of guilt. Wilson contends that the statement actually demonstrated that he was afraid of the gang to which the victim belonged and did not want "Turtle" spreading rumors that might place Wilson in danger of retaliation by that gang. In support of this interpretation, Wilson sought to present four witnesses who allegedly would have testified that they and the victim, but not Wilson, were all members of the Valley gang, "a violent, notorious gang in the neighborhood near where the crime occurred." Brief of Appellant, at 26.

The trial court precluded this testimony on the basis that there was no evidentiary support for Wilson's assertion that any member of the Valley gang had ever threatened him and that Wilson only sought to introduce this

evidence of the victim's gang membership to impugn his character. The court concluded that the probative value of the gang evidence was outweighed by its potential for unfair prejudice and confusion of the issues, and was properly excluded pursuant to Pa.R.E. 403.[5] The court also noted that Wilson was not asserting self-defense, in which case he would have been entitled to introduce evidence to prove the victim's propensity for violence.

> We begin by noting:
>
> In general, relevant evidence, i.e., evidence that logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable, or supports a reasonable inference or presumption regarding a material fact, is admissible. However, relevant evidence may be excluded if its probative value is outweighed by the likelihood of unfair prejudice. Admission of evidence rests within the sound discretion of the trial court, which must balance evidentiary value against the potential dangers of unfairly prejudicing the accused, inflaming the passions of the jury, or confusing the jury.

***Commonwealth v. Jordan***, 65 A.3d 318, 324-25 (Pa. 2013) (internal citations, quotation marks and brackets omitted). A trial court's ruling

_____

[5] Pennsylvania Rule of Evidence 403 provides as follows:

> The court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

Pa.R.E. 403.

regarding the admission of evidence will not be disturbed on appeal unless that ruling reflects manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support to be clearly erroneous. ***Commonwealth v. Minich***, 4 A.3d 1063, 1068 (Pa. Super. 2010) (citations omitted).

We begin by noting that Wilson's brief contains no citation to case law which might support his contention that evidence of the victim's criminal gang activity should have been admitted to counter the Commonwealth's consciousness-of-guilt evidence. Where an appellant offers no citation to pertinent case law or other authority in support of an argument, the claim is waived. ***Commonwealth v. Hernandez***, 39 A.3d 406, 412 (Pa. Super. 2012).

Even if the claim were not waived, we can discern no abuse of discretion on the part of the trial court in concluding that the gang testimony was nothing more than an attempt by the defense to impugn the victim's character and that its effect would have been more prejudicial than probative and may have confused the jury. Wilson proffered no evidence that members of the victim's gang had made any threats against him or had engaged in any efforts to retaliate against him for shooting the victim. Absent such evidence, testimony regarding the victim's gang involvement would only have led to speculation on the part of the jury. In any event, evidence of the victim's gang membership was, in fact, presented to the jury through the admission of Wilson's penalty phase testimony from the 1988

trial, in which he stated that the victim "ran the whole gang of theirs." **See** N.T. Trial, 3/27/14, at 127. Accordingly, this claim garners Wilson no relief.

In a related claim, Wilson asserts that the trial court erred by admitting Patterson's testimony regarding the accusation made by "Turtle," as well as other testimony suggesting that "Turtle" was an eyewitness to the shooting. Wilson alleges that these errors allowed the Commonwealth to benefit from its earlier **Brady** violations and violated due process of law and the right to confrontation.

Initially, Wilson asserts that, although Turtle's statement was ostensibly not admitted for the truth of the matter asserted, i.e., that Wilson had killed the victim, "there was little possibility that the jury would not consider [the] statement for [its] truth[.]" Brief of Appellant, at 31. Wilson argues that the admission of Turtle's statement "effectively injected a second eyewitness into the case" in violation of his right to confrontation because Turtle has since died. The trial court found that Turtle's statement was admissible because of Wilson's reaction to it, which was "highly probative" of his guilt. Trial Court Opinion, 11/26/14, at 10.

A statement is inadmissible hearsay if it is one that the declarant does not make while testifying and a party offers the statement in evidence to prove the truth of the matter asserted. Pa.R.E. 801(c). However, in this case, Patterson's testimony regarding Turtle's statement was not presented for its truth, but rather to demonstrate Wilson's consciousness of guilt based on his response to the statement. As such, Wilson's Sixth Amendment right

to confront Turtle was not implicated. ***Crawford v. Washington***, 5541 U.S. 36 (2004) ("The Clause also does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.") Moreover, Wilson did not request a limiting instruction on the issue and the claim is, accordingly waived.[6] ***See Commonwealth v. Wholaver***, 989 A.2d 883, 892 (Pa. 2010) (where trial counsel objected to the admission of evidence but did not request a limiting instruction, the issue of trial court error for not giving such instruction is waived).

Wilson also asserts that the trial court erred in admitting other testimony and argument suggesting that Turtle was at the bar at the time of the shooting and was not called to testify at trial only because he was dead. Wilson specifically objects to three exchanges that occurred during trial. First, Patterson testified that Turtle was among a group of people walking with the victim to the bar where he was shot and that he (Patterson) subsequently had a conversation with Turtle about the incident. Second, Harold Higgins testified that he was present in the bar during the shooting and was asked to name specific people he saw in the bar. When Higgins failed to name Turtle, the prosecutor asked him if he would have recognized Turtle. Higgins denied that he would have, at which time the prosecution

---

[6] In its Rule 1925(a) opinion, the trial court noted that, had a limiting instruction been requested, it would have given one "both when the statement was admitted and during the final charge." Trial Court Opinion, 11/26/14, at 11 n.7.

introduced Higgins' prior inconsistent police statement, in which he stated that he had seen Turtle in the bar. During closing arguments, the prosecutor reiterated that Higgins had seen Turtle in the bar. Finally, also during closing arguments, the prosecutor

> tied together all the references to Turtle, his presence in the bar, and his naming [Wilson] as the shooter, arguing, "You've heard that there are witnesses and names that can't be presented to you because they've died, but justice will not be outlived. [Wilson] can't hide behind the fact that other people may have died."

Brief of Appellant, at 33.

Wilson argues that the above testimony and argument, combined with Turtle's statement to Patterson that Wilson had shot the victim, implied to the jury that Turtle witnessed the shooting and would have testified, but for the fact that he had died. Wilson also alleges that it "allowed the Commonwealth to present Jeffrey Rahming [(Turtle)] as a witness without exposing him to significant impeachment evidence which formed the basis of serious *Brady* violations from the 1988 trial." *Id.* at 35. These claims are meritless.

Placed in its proper context, the testimony and argument of which Wilson complains does not have the effect of implying to the jury that Turtle witnessed the shooting. The following is the testimony of Michael Patterson cited by Wilson:

> Q: And what, if anything, happened when you were on Fox Street in front of the tire shop?

- 14 -

A:  I observed Jamie, Kenny Mozelle, Turtle, and Peanut coming down the street.

Q:  Was anyone with them other than Jamie, Kenny, and Turtle?

A:  It was Jamie – Jamie, Kenny, Turtle, and Peanut was right there coming down the street.  Now, that's what you asked me, who was coming down the street with them?

Q:  Yes, Did you know a guy named Carl Rowland?

A:  And Carl Rowland.  I'm sorry.

Q:  Let me ask you this question.  Do you know a guy named Carl Rowland?

A:  Yes.

Q:  And at the time that you saw Jamie, Kenny, and Turtle, did you see Carl Rowland as well?

A:  Yes. He was walking down the street with them when they came.

Q:  Now, when you were at the tire shop, were you on the same side of the street as the tire shop or on the opposite side of the tire shop?

A:  I was on the opposite side.

Q:  Okay.  And what, if anything, did you see happen?

A:  Well, I seen Jamie, Turtle, Carl Rowland, Kenny Mozelle coming down the street and they had walked past us, was walking up, you know, towards us, and Jamie smiled at [Wilson] and then [Wilson] looked back at him, you know, with not a smile, and –

Q:  Let me stop you there for one moment.  What was the expression that Jamie did when he walked past [Wilson]?

A:  He gave him a big smile.

N.T. Trial, 3/25/14, at 193-94.

Nothing in this testimony – in which Patterson simply listed the names of the individuals who accompanied the victim as he walked down the street prior to entering the bar – suggested that Turtle was an eyewitness to the crime.

Wilson also complains of the following testimony by Harold Higgins:

Q: Okay. Now, back on August 3rd of 1981 at around 1:19 p.m., so in the afternoon, were you inside the Sweet Joy Lounge?

A: Yes, I was.

Q: Now, when you came into the bar did you have occasion to see Jamie Lamb?

A: Yes.

Q: Was Jamie Lamb already in the bar when you got there?

A: Yes, I think he was, yes.

Q: Okay. Now, what part of the bar did you go to?

A: I was in the back of the bar.

Q: And specifically what was around you?

A: At the time it was a pool table, a music – a jukebox was there, and the stage was there.

Q: Okay. Now, when you were back by the pool table, did you hear anything?

A: Well, yes, I did.

Q: What did you hear?

A: Gunshots.

Q: And how many gunshots did you hear?

A: The most I heard between five and six at the time.

. . .

Q: And now, other than Mr. Lamb being on the floor, were there other people in the bar at the time?

A: Yes, at the time, yes it was.

Q: And now, as you sit here today do you know how many people total were in that bar?

A: I can't really give you a number, but it was a few people in there.

Q: Okay. And some of the people in the bar, did you know them?

A: Not – the ones that was in the bar?

Q: Yes.

A: No, I haven't.

Q: When you came from the pool room to see Mr. Lamb on the ground, did you see anyone in the bar at that time that you recognized?

A: The ones that was in the bar with us?

Q: Yes.

A: Yes, it was a few guys from the neighborhood was in there.

Q: And the guys from the neighborhood that you knew, who were they guys that were in the neighborhood that you saw in there?

A: You want their names?

Q: Yes.

A: Kenny Mozelle was in there.

Q: Okay.

A: To my knowledge. And it was myself.

Q: Anybody else you recognized?

A: Not offhand.

Q: Now, do you know a guy named Carl Rowland?

A: Carl Rowland?

Q: Yes. Did you know a Carl?

A: Yes.

Q: And did you see Carl in the bar?

A: At the time, no, I haven't.

Q: Okay. And did you know a guy named Turtle?

A: I know him, but I didn't know him.

Q: So when you say –

A: No.

Q: Did you know him to see him?

A: What?

Q: Did you know him to see him?

A: No.

Q: Turtle? Okay. Now, Mr. Higgins at some point two days after Jamie died did you talk to the police?

A: Yes, I have.

*Id.* at 285-86; 288-89. The Commonwealth proceeded to introduce Higgins'

statement to police in which he stated that Turtle was in the bar at the time

of the shooting. Subsequently, during closing arguments, the

Commonwealth referred to Higgins' testimony as follows:

> MS. KIRN: . . . Harold Higgins. He said he lived in that neighborhood his whole life and he never saw [Wilson]. You want to be told that, oh, [Wilson], he's from the neighborhood. No. He lives on 35th Street. This happened at 24th and Allegheny. So by my math, that's at least 11 blocks away. And we all know from living in Philadelphia that 11 blocks away is not considered the same neighborhood.
>
> Harold Higgins saw a number of people in the bar, including Jamie's friends that Michael Patterson described as having been with him and walking to the bar. He saw Carl, he saw Kenny, and he saw Turtle.
>
> He says the bar was bright. You link that with Carnell Biggins. Carnell Biggins said that [Wilson] had on a Kool cap, he was five-eight in height, he sees him running from the direction of the bar. Let's not confuse ourselves here. Carnell Biggins saw one and only one person run from that bar. So he's seeing as [Wilson] runs out.

N.T. Trial, 4/1/14, at 98-99.

Higgins' testimony – and the Commonwealth's use of his prior

inconsistent statement to demonstrate that Higgins had seen Turtle with the

victim – was clearly introduced to corroborate the testimony of Michael

Patterson, who also identified those individuals as having been with the

victim as he walked to the bar. Likewise, the Commonwealth's closing

reference to Higgins' identification of Carl Rowland, Kenny Mozelle and Turtle

was used to highlight the corroboration between Higgins' testimony and that of Patterson.

Finally, Wilson asserts that a portion of the Commonwealth's closing argument improperly implied that Turtle witnessed the shooting. The Commonwealth began its closing statement as follows:

> MS. KIRN: You know, as we're growing up, there are certain things that our mothers tell us every time to get us through the hard times. They tell us every cloud has a silver lining. They tell us tomorrow is another day. But this case has disproven one of the things that my mom used to always tell me because when I was sad and I would cry, my mom would lean down and kiss my head and she would tell me time heals all wounds.
>
> Ladies and gentlemen, time did not heal the wound that struck Jamie Lamb's arm. Time didn't heal the bullet that flew across his back. Time couldn't heal the third injury when Jamie who couldn't be Superman put his arm up to stop the bullets that were coming. Time couldn't heal the injury that went into his side. And time couldn't stop that fifth bullet that lodged in him. Time couldn't change that. Time couldn't heal that. And those wounds shot and inflicted by Zachary Wilson buried Jamie Lamb.
>
> The other wound that didn't heal, you saw Cathy Lamb, a proud old[er] sister, and she came into this stand and she said Jamie Lamb was my younger brother. And when we started out, you may have thought, well, it's from 1981, who cares. You saw that the wounds that were inflicted are just as raw and just as strong today when she sat up here and she opened herself up to you and cried, because people can have memories. And time didn't heal Cathy Lamb.
>
> In fact, even with all these years, Officer Andrejczak told you that this bullet that was recovered from the floor, this bullet, it's mangled, came from a nine millimeter gun. This bullet still when you look at it under a microscope bore blood, tissue, from the torn skin that it went through. And so I say to you, ladies and gentlemen, that this case cries out for justice.

You've heard that there are witnesses and names that can't be presented to you because they've died, but justice will not be outlived. [Wilson] can't hide behind the fact that other people may have died.

MR. WISEMAN: Objection, Your Honor.

THE COURT: All right. The jury shouldn't draw any inference about what anybody who may have died would or would not have said. This is argument.

N.T. Trial, 4/1/14, at 69-71.

This portion of the Commonwealth's argument did not imply that Turtle had witnessed the shooting, but was an emotional appeal, emphasizing to the jury the importance of obtaining justice for the victim despite the passage of time. Moreover, upon objection by defense counsel, the trial court gave an instruction to the jury, cautioning the panel not to draw improper inferences from the prosecution's argument.

In sum, taken in their proper context, none of the testimony and argument highlighted by Wilson could reasonably be viewed to have deprived Wilson of his due process or confrontation rights. Accordingly, these claims are meritless.

Wilson next asserts that the trial court erred in admitting prior consistent statements of Edward Jackson because they improperly bolstered his in-court testimony. Wilson argues that the court's ruling violated Pa.R.E.

613(c)(1) and (2),[7] as some of the statements either were made after the alleged defect arose or failed to suggest that Jackson never made the inconsistent statement or explain why he did so. In allowing the prosecutor "free reign to bring in every statement ever made by Jackson . . . the trial court blunted the effect of impeachment which would have been clear in a properly conducted trial." Brief of Appellant, at 42.

The trial court concluded in its opinion that all of the prior consistent statements admitted at trial "in some manner supported Jackson's explanations of his inconsistent statements and were therefore admissible under Rule 613." Trial Court Opinion, 11/26/14, at 15. We agree with the trial court.

_____

[7] Rule 613(c) provides, in relevant part, as follows:

> (c) Witness's Prior Consistent Statement to Rehabilitate. Evidence of a witness's prior consistent statement is admissible to rehabilitate the witness's credibility if the opposing party is given an opportunity to cross-examine the witness about the statement and the statement is offered to rebut an express or implied charge of:
>
> (1) fabrication, bias, improper influence or motive, or faulty memory and the statement was made before that which has been charged existed or arose; or
>
> (2) having made a prior inconsistent statement, which the witness has denied or explained, and the consistent statement supports the witness's denial or explanation.

Pa.R.E. 613(c).

Evidence of a prior consistent statement by a witness is admissible for rehabilitation purposes under the Pennsylvania Rules of Evidence in two instances. First, it is admissible if "the opposing party is given an opportunity to cross-examine the witness about the statement, and the statement is offered to rebut an express or implied charge of fabrication, bias, improper influence or motive, or faulty memory and the statement was made before that which has been charged existed or arose." Pa.R.E. 613(c)(1). Second, it is admissible if "the opposing party is given an opportunity to cross-examine the witness about the statement, and the statement is offered to rebut an express or implied charge of having made a prior inconsistent statement, which the witness has denied or explained, and the consistent statement supports the witness' denial or explanation." Pa.R.E. 613(c)(2).

*Commonwealth v. Harris*, 852 A.2d 1168, 1175 (Pa. 2004).

Here, Wilson cites to several instances in which the trial court allowed the Commonwealth to introduce prior consistent statements to rebut prior inconsistent statements introduced for impeachment purposes on cross-examination. Wilson argues that such statements should only have been admitted if they explained or pre-dated his inconsistent statements. This is an inaccurate statement of the law.

Rule 613(c)(2) provides that prior consistent statements are admissible to rebut a charge of having made a prior inconsistent statement, regardless of the timing of the prior consistent statements. *Harris*, 852 A.2d at 1176.

As the Official Comment to Rule 613 explains: Pa.R.E. 613(c)(2) is arguably an extension of Pennsylvania law, but is based on the premise that when an attempt has been made to impeach a witness with an alleged prior inconsistent statement, a statement consistent with the witness' testimony should be admissible to rehabilitate the witness if it supports the witness' denial or explanation of the alleged inconsistent statement.

- 23 -

Where there has been a denial of the alleged inconsistent statement, the consistent statement should almost invariably be admitted, regardless of its timing.

*Id.* "[E]vidence of prior consistent statements[,] made after an acknowledged prior inconsistent statement[,] has been admitted into evidence when evidence of the prior consistent statements was relevant to support an explanation given for the acknowledged inconsistent statement." ***Commonwealth v. Willis***, 552 A.2d 682, 693 (Pa. Super. 1988).

Wilson complains of the admission of several prior consistent statements. First, under direct examination, Jackson testified that, at the time of the shooting, there was bright sunshine coming in through the glass door of the bar. On cross-examination, defense counsel confronted Jackson with a statement he had given on the day of the shooting in which he stated "It was a red light all the way down the bar. The light wasn't that good, but [Wilson] was close enough for me to see him good." N.T. Trial, 3/31/14, at 68. Jackson responded by clarifying that "[t]hat's when I was on the floor" after the shots were fired. *Id.* On re-direct, the prosecutor introduced Jackson's 1988 trial testimony, in which he had stated that it was light where he had been sitting in the bar, although the lights were dimmed in the back of the bar. We conclude that the 1988 prior consistent statement was admissible to rebut the defense claim that his 2014 trial testimony was the product of faulty memory, as it was consistent with his 2014 testimony that the front of the bar, where Jackson was sitting prior to the shooting, was light.

Jackson also testified on direct examination that he was sitting in the middle of the bar, or about the fourth seat in, at the time the shooting occurred. On cross-examination, defense counsel impeached Jackson with his testimony from the 1988 trial, in which he stated that he sat in the first seat at the bar. Jackson denied remembering giving that answer:

Q:  Do you recall giving that answer?

A:  No.

Q:  Is it a fair reading of what's in the transcript?

A:  No.

Q:  I didn't read that accurately?

A:  I imagine you did, but I wasn't at the first seat in the bar.

Q:  So what you said in 1988 wasn't correct?

A:  If I said the first seat, I wasn't in the first seat at the bar.

N.T. Trial, 3/31/14, at 73.

Subsequently, on re-direct examination, the Commonwealth introduced Jackson's testimony on cross-examination from the 1988 trial in which he agreed with defense counsel's statement that he had been sitting in seat number three. This prior statement, which was consistent with Jackson's testimony on direct examination that he was sitting in the middle

of the bar, was admissible to rebut the defense's claim of faulty memory and clarify his 2014 testimony.[8]

Wilson also challenges the introduction of Jackson's entire description of the shooting from the police statement he gave in 1981 on the day of the shooting. Wilson's entire claim as to the 1981 police statement is as follows:

> During re-direct examination, the prosecutor read the entire description of the shooting from Jackson's police statement made on the day of the shooting.

Brief of Appellant, at 40.

Wilson fails to provide any argument on this claim or to specify the manner in which the admission of that statement violated Rule 613. It is not the obligation of this Court to formulate an appellant's arguments for him. ***Commonwealth v. Johnson***, 985 A.2d 915, 924 (Pa. 2009) (citation omitted). "[W]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived." ***Id.*** Because this claim is presented in a conclusory fashion without argument or citation to authority, it is waived.

---

[8] Wilson asserts that the prior consistent statement was the product of the 1988 defense counsel's misstatement "that Jackson had testified during direct [in 1988] that he sat in the third seat and Jackson – quizzically – assented." Brief of Appellant, at 40. While the 1988 transcript states that Jackson did testify on direct that he had been sitting in the first seat, 1988 defense counsel failed to raise this discrepancy on re-cross examination.

Jackson also testified on direct examination at trial that, immediately after the shots were fired, he and the shooter were face-to-face together on the floor of the bar. On cross-examination, Jackson testified that the shooter's head was "a little bit above [Jackson's] head." N.T. Trial, 3/31/14, at 82. Defense counsel thereafter impeached Jackson with his testimony from Wilson's 2013 trial that he was "sideways" while the shooter was "straight up and down," as well as his 1988 trial testimony that Jackson's head was at the shooter's waist. *Id.* at 83, 85. On re-direct examination, the prosecution introduced Jackson's 1981 police statement in which Jackson stated that he "was right up on [the shooter] about a foot away. He was right next to me. I saw his whole face at different times." *Id.* at 130. Once again, this statement was admissible because it rebutted the defense's claim of faulty memory.

Finally, Jackson testified at trial that, when presented with a lineup in March 1982, he recognized Wilson, but identified the wrong person to police because he was scared and did not want to get involved. Defense counsel impeached Jackson on cross-examination using his 1982 statement, given the night of the lineup, in which he told police that the reason he did not identify the actual shooter in the lineup was because he "got nervous and [he] didn't really remember what the guy looked like." *Id.* at 106. The defense further impeached Jackson with his 1997 PCRA hearing testimony in which the following exchange transpired between Jackson and defense counsel:

Q: In 1987 you told the officers that, in fact, Mr. Wilson was in the lineup but you indicated he wasn't at that time because you had been threatened?

A: Yes.

THE COURT: Had you been threatened?

A: Yes, sir, I was. It was – I was threatened as far as being a witness.

THE COURT: But you did recognize him in the lineup in 1981?

THE WITNESS: No, sir.

MR. WISEMAN: '82, Your Honor.

THE WITNESS: And I explained that to the policeman I wasn't sure that was him in the lineup.

THE COURT: When did you become sure?

THE WITNESS: When they showed me the photos, showed me photos and asked me look at it hard, did I recognize him.

N.T. PCRA Hearing, 11/24/97, at 21-22.

During re-direct examination, the prosecution introduced a police statement[9] from July 3, 1997 in which Jackson stated that he recognized the shooter in the original lineup. *See* N.T. Trial, 3/31/14, at 135. As with the previous prior consistent statements introduced by the Commonwealth, this statement, which was consistent with Jackson's testimony on direct examination that he recognized Wilson in the lineup but identified the wrong person because he was scared, was admissible to rebut the defense's claim of faulty memory and clarify his testimony on direct.

---

[9] In his brief, Wilson mischaracterizes the 1997 police statement as testimony from the PCRA hearing.

Wilson next asserts that the trial court abused its discretion when it admitted a portion of his 1988 penalty phase testimony. Specifically, Wilson objects to the portion of his testimony in which he stated that he did not kill the victim but wished he had because the victim had killed his brother. Wilson claims that the admission of this testimony violated his due process rights because his conviction was a product of earlier *Brady* violations by the Commonwealth, and the penalty phase testimony was the fruit of those violations. In support of his claim, Wilson cites *Harrison v. United States*, 392 U.S. 219 (1968). In *Harrison*, an appeals court determined that the police had illegally obtained the murder defendant's confession and the confession was, therefore, inadmissible. On remand for a new trial, the prosecution introduced the defendant's testimony from the first trial, in which he admitted to being at the scene of the murder with a shotgun in his hand. The defendant was convicted and the appellate court affirmed. The Supreme Court granted certiorari to determine whether the defendant's trial testimony was the inadmissible fruit of the illegally procured confessions and concluded that it was. The Court held that the defendant's testimony was inadmissible because he had testified only after the government had illegally introduced into evidence wrongfully obtained confessions. Because defendant's testimony was impelled by a desire to overcome the impact of the illegally obtained confessions, his testimony was "tainted by the same illegality that rendered the confessions themselves inadmissible." *Id.* at 223.

Wilson argues that the same rationale should apply in the instant matter. Because his 1988 conviction was obtained as a result of constitutional violations by the Commonwealth, Wilson asserts, the penalty phase testimony should be declared inadmissible as the fruit of the poisonous tree. We disagree.

"It has long been recognized that testimony from an earlier trial may be introduced in the prosecution's case against a defendant regardless of whether that defendant takes the stand or not in the second proceeding." *Commonwealth v. Boyle*, 447 A.2d 250, 256 (Pa. 1982). In *Harrison*, *supra*, the Supreme Court carved out a narrow exception to that general rule, holding that a defendant's testimony impelled by the introduction of illegally obtained confessions is the barred from use in a subsequent trial as the fruit of the poisonous tree. However, the Court specifically emphasized that its holding was limited only to cases "in which the prosecution illegally introduced the defendant's confession in evidence against him at trial in its case in chief." *Harrison*, 392 U.S. at 223 n.9. Accordingly, *Harrison* does not control here.

In any event, the testimony of which Wilson complains was merely cumulative to other evidence introduced at trial. The Commonwealth introduced Wilson's 1981 testimony as evidence of Wilson's motive for killing the victim, i.e., that the victim had killed Wilson's brother. This motive evidence was also introduced through the testimony of Michael Patterson, who testified that Wilson told him he was going to "get with" the victim

- 30 -

because the victim had killed his brother. Accordingly, any error in admitting Wilson's testimony from the penalty phase of his earlier trial was harmless. **See Commonwealth v. Young**, 748 A.2d 166, 176 (Pa. 1999) (improperly admitted evidence merely cumulative of other evidence and had no effect on verdict; therefore, any error in admitting testimony harmless).

Finally, Wilson claims that the trial court erred in denying his motions seeking discovery pertaining to the medical reasons for the five-day delay in the testimony of Commonwealth witness Edward Jackson. Jackson was slated to testify on March 26, 2014. However, on that morning, the prosecutor informed the court that Jackson had been sick. Jackson appeared later in the day, at which time the trial judge questioned him from the bench regarding his condition. Jackson stated that he "d[id]n't feel good at all," had just vomited and felt warm. N.T. Trial, 3/26/14, at 46-47. The court postponed Jackson's testimony until the following day. However, Jackson remained ill the next day and the prosecution presented a physician assistant's note indicating he was suffering from the flu. Defense counsel requested discovery relating to the nature of Jackson's illness, suggesting it may actually be related to "alcohol, drugs, some other illness that may impact on credibility, his ability to recall[.]" N.T. Trial, 3/27/14, at 8. The court denied the request, stating that it believed Jackson was ill and would not order his doctor to turn over his medical records. Ultimately, Jackson testified on March 31, 2014. The defense again requested discovery on the issue in its post-sentence motions, which the trial court denied. Wilson

asserts that, given the Commonwealth's "history of **Brady** violations, including multiple ones related to Jackson impeachment material," the court should have allowed him to further pursue the requested discovery "and potentially reveal[] another cover-up scheme." Brief of Appellant, at 53.

In its opinion, the trial court framed this issue as implicating the court's authority to "reasonably control the mode and order of examining witness[es] and the presentation of evidence." Trial Court Opinion, 11/26/14, at 18, citing Pa.R.E. 611(a) (Mode and Order of Examining Witnesses and Presenting Evidence). The court concluded that Jackson was "demonstrably ill" and had presented a note from his doctor. Accordingly, the court was within its discretion to postpone Jackson's testimony for a few days.

In his brief, Wilson frames the issue as one of discovery and cites Pa.R.Crim.P. 573(B)(2)(a)(iv), which provides, in relevant part, as follows:

> (a) In all court cases, . . . if the defendant files a motion for pretrial discovery, the court may order the Commonwealth to allow the defendant's attorney to inspect and copy or photograph any of the following requested items, upon a showing that they are material to the preparation of the defense, and that the request is reasonable:
>
> . . .
>
> (iv) any other evidence specifically identified by the defendant, provided the defendant can additionally establish that its disclosure would be in the interests of justice.

Pa.R.Crim.P. 573(B)(2)(a)(iv).

Questions involving discovery in criminal cases lie within the discretion of the trial court and that court's decision will not be reversed unless such discretion was abused. ***Commonwealth v. Rucci***, 670 A.2d 1129, 1140 (Pa. 1996).

Here, we can discern no abuse of discretion on the part of the trial court in refusing to allow Wilson to access Jackson's medical records. The record is devoid of any evidence that Jackson ever suffered from a drug or alcohol problem, and Wilson points to none in his brief. Wilson's requests appear to have been based on nothing more than mere speculation and suspicion of the Commonwealth. Moreover, defense counsel was free to cross-examine Jackson regarding any factor that may have impacted his ability to testify truthfully or recall the events in question. Accordingly, Wilson is entitled to no relief.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/3/2016

- 33 -