**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| RONALD LEE WEISS | : | |
| | : | |
| Appellant | : | No. 315 WDA 2022 |

Appeal from the Order Entered June 10, 2021
In the Court of Common Pleas of Indiana County Criminal Division at
No(s):  CP-32-CR-0000218-1997

BEFORE:  MURRAY, J., McLAUGHLIN, J., and PELLEGRINI, J.[*]

DISSENTING MEMORANDUM BY PELLEGRINI, J.:

**FILED: September 27, 2023**

In this case, the record demonstrates that the Commonwealth lied on multiple occasions to the trial court, defense counsel and the jury about material consideration it had provided to key witnesses.  It then compounded that misconduct by eliciting false testimony at trial from not only two jailhouse witnesses, but also from a Pennsylvania State Police (PSP) Trooper involved in the investigation.  All of this in service of obtaining a conviction *and the death penalty* in a murder case it had been unable to successfully prosecute for nearly two decades.

---

[*] Retired Senior Judge assigned to the Superior Court.

I agree that "dismissal of charges is an extreme sanction that should be imposed sparingly and only in cases of blatant prosecutorial misconduct." ***Commonwealth v. Wilson***, 147 A.3d 7, 13 (Pa. Super. 2006). This is one of those rare cases. The Commonwealth's misconduct prior to and during Weiss's trial constituted prosecutorial overreaching so egregious that it should now be precluded from re-trying him for Brenda Bruzda's murder. To hold otherwise would render toothless the protections of Article 1, Section 10 of our constitution. I respectfully dissent.

**I.**

**A.**

A much fuller explanation of the Commonwealth's misconduct than provided by the majority is needed to explain the level of overreaching that occurred here. Briefly, Bruzda disappeared in 1978 and her body was not found until approximately five months later. As one of the last people who had seen her alive, Weiss was an immediate suspect in her disappearance and the later murder investigation. He repeatedly denied any involvement when confronted by police and Bruzda's mother.

In 1985, Weiss was charged with the murder after his ex-wife, Sharon Pearson, reported to police that she had cleaned blood out of Weiss's vehicle the day after Bruzda's disappearance and that the quilt Bruzda's body was found in had belonged to her and Weiss. They no longer had the vehicle in question, so law enforcement was unable to examine it. The Commonwealth

ultimately *nolle prossed* the charges against Weiss because Pearson could not testify against him based on spousal privilege. Next, in 1993, an investigative grand jury was impaneled but did not return an indictment of Weiss. As of 1995, the Attorney General's Office notified the PSP that it would not proceed further with the prosecution because it did not believe it could successfully obtain Weiss's conviction for the murder.

The tides changed after Attorney J. Scott Robinette assumed responsibility for reopening the investigation into the cold case. As part of the investigation, he requested that the PSP speak with individuals who had been incarcerated with Weiss in the past. Two of those individuals, Kermeth Wright and Samuel Tribuiani, ultimately told PSP Trooper John R. Tamewitz that Weiss had confessed to Bruzda's murder while they were incarcerated together. Armed with these statements from previously-unknown witnesses, the Commonwealth again charged Weiss with Bruzda's murder.

Trooper Tamewitz first obtained a statement from Tribuiani on April 2, 1996, implicating Weiss in the murder. At that time, Tribuiani did not make any requests for consideration and Trooper Tamewitz did not make any promises in exchange for his testimony. The next day, however, Tribuiani contacted Trooper Tamewitz and requested help with expediting his release from state prison. He was not yet eligible for parole but was eligible for a pre-release program to a halfway house. Trooper Tamewitz contacted the prosecuting attorney to ask about Tribuiani's status for release, and in a memo

dated April 8, 1996, Attorney Robinette wrote that after discussion with a Senior Deputy Attorney General in his office, he intended to contact the prison about expediting Tribuiani's release. Upon learning that Tribuiani was awaiting approval for pre-release, he decided to contact interested parties about Tribuiani's status.

He did so the following day, sending letters to the sentencing judge, the prosecuting attorney and the victim-witness advocate in Tribuiani's case requesting that they consider his "valuable cooperation with [this] office if and when [they] register any response to the Department of Corrections' proposal for early release." Trial Court Opinion, 6/10/21, at 8-9. Tribuiani was blind copied on the letters. Attorney Robinette also spoke with the prosecuting attorney about the matter on the phone. On May 1, 1996, the victim-witness advocate responded to Attorney Robinette with a letter that stated, "I concur that we have no opposition to Mr. Tribuiani being released to a halfway house as part of his pre-release program. I hope this leads to the testimony needed to get a conviction in the 1978 murder case." N.T., 1/15/19, at 53. Tribuiani was released from prison on July 5, 1996, though he was reincarcerated in June of 1997, prior to Weiss' trial, due to violating the conditions of his release.

Wright initially gave his statement inculpating Weiss to PSP Trooper Jeffrey Witmer in July of 1995 in an interview at his home. At that time, he told Trooper Witmer, "I'll never tell, I don't squeal." *Id.*, Exhibit 15. In December of 1995, however, Wright was reincarcerated and agreed to speak

with Trooper Tamewitz about Weiss's confession to him years earlier. He signed the official version of his statement in January of 1996 after speaking with his wife. Wright subsequently asked Attorney Robinette or Trooper Tamewitz to inform the Pennsylvania Board of Probation and Parole (PBPP) of his cooperation in the case. In December of 1996, Attorney Robinette wrote a letter to the Chairman of the PBPP, which was blind copied to Wright, in which he said, "[t]his [o]ffice has promised nothing to Mr. Wright in exchange for his cooperation. I have explained to him that parole authority in his case rests exclusively with the [PBPP]. I am writing this letter merely to inform the Board of Mr. Wright's cooperation in the investigation and potential prosecution of a very serious crime." Trial Court Opinion, 6/10/21, at 9-10. Attorney Robinette received a response indicating that his letter would be included in Wright's file for the PBPP to review in considering his parole. Additionally, in April of 1997, Wright pled guilty to lying to an employee in state prison, a fact that Attorney Robinette did not disclose to the defense. *Id.* at 10.

In May of 1997, *after* Attorney Robinette had undertaken these efforts on behalf of Tribuiani and Wright, the parties attended a pre-trial hearing on the defense's motion for discovery for impeachment information. As the trial court explained:

> [T]he Commonwealth was ordered to notify the defense of "any deals or understandings made between the Commonwealth and potential witnesses, Tribuiani and Wright." In response to direct inquiry by the [c]ourt on this matter Robinette stated "[d]eals, we

don't have any deals with them, Judge." The [c]ourt then stated "the motion is granted and the answer is that there are no deals or consideration."

Later in the pretrial motion hearing of May 16, 1997, Robinette stated "I would just like to make on the record we have made no threats or promises and the only representation that we have made to these witnesses is that we will honestly report the level and extent of their cooperation and tell the truth about what they do and that is one part of it and we will take reasonable steps to protect their safety and those are the only representations that we have ever made to those witnesses. [*sic*]"

. . . [O]n May 20, 1997, Robinette authored and presented a letter to defense counsel stating that the Commonwealth will only report the nature and extent of the witnesses' cooperation *whenever queried regarding the same*. Robinette obviously had already written multiple letters on behalf of Tribuiani and Wright at the time this letter was submitted.

*Id.* at 10-11 (numbering omitted, emphasis added). Further, in July of 1997, Attorney Robinette wrote a letter to the superintendent of S.C.I. Somerset identifying Wright as a Commonwealth witness and requesting that he be moved for his physical safety. He stated, "Mr. Wright has expressed a preference for S.C.I. Laurel Highlands." *Id.* at 12 (cleaned up).

When Weiss proceeded to trial in July of 1997, Tribuiani and Wright testified that he had admitted to Bruzda's murder in conversations in 1993 and 1985, respectively. In response to questioning by Attorney Robinette, both witnesses testified that they did not ask for or receive anything in consideration for their testimony. Trooper Tamewitz likewise testified, on questioning by Attorney Robinette, that Tribuiani had not been promised anything in exchange for his testimony. Attorney Robinette made no efforts

to correct this testimony by any of the witnesses. The jury ultimately convicted Weiss of the murder and sentenced him to death.

Soon after the trial concluded, Attorney Robinette wrote to the PBPP on behalf of Tribuiani and Wright, asking that it "consider [their] contribution to this most unusual prosecution when evaluating the propriety of granting [them] parole." *Id.* at 13, 15. In September of that year, he wrote a similar letter to the superintendent of S.C.I. Graterford requesting his consideration in commenting about Tribuiani's release on parole. Finally, after the trial, Tribuiani wrote several letters to Attorney Robinette, including one thanking him for his assistance in expediting his release and parole. *Id.* at 13-14.

Upon considering this information in *habeas corpus* proceedings, the federal court concluded that "the Commonwealth engaged in a pattern of prosecutorial misconduct that resulted in a fundamentally unfair trial." **Weiss v. Wetzel**, No. 2:02-CV-01566, 2018 WL 895689, at *1 (W.D. Pa. Feb. 14, 2018). It issued a lengthy decision detailing its factual findings and the relevant law and ultimately concluded:

> When prosecutors do secret deals, suppress evidence of them, stand by silently when the witnesses they determine to be central to their case lie about those deals, and then cover their tracks with their own false statements in and to a trial court, all in a way that plainly impacts the course and outcome of the trial, both those charged with crimes and the public are deprived of the fair trial that our Constitution commands, and to which they are entitled under the law. And this is obviously even more the case when the state seeks, and a defendant is exposed to, the ultimate penalty that our legal system may exact in a capital case. For the reasons set out above, Weiss was denied a fair trial because the Commonwealth materially "corrupted the truth-seeking function

- 7 -

of the trial by knowingly presenting or failing to correct perjured testimony." [***Haskell v. Superintendent Greene SCI***, 866 F.3d 139, 152 (3d Cir. 2017).] But so too the citizens of the Commonwealth were denied the resolution of Ms. Bruzda's murder that a fair trial can deliver for them. The constitutional errors here were manifest, fundamental and material, and wholly avoidable had the representatives of the Commonwealth told the truth.

Weiss has demonstrated that the Commonwealth denied him a fair trial by knowingly presenting false testimony at his trial and by concealing from the defense and the trial court the evidence that would have revealed that false testimony, evidence that plainly raised serious questions concerning Tribuiani's and Wright's motives for testifying and their credibility when they did so. Weiss did not receive a fair trial, and the result is that the outcome of that trial is unworthy of confidence.

***Id.*** at 20. It, therefore, conditionally granted the writ of *habeas corpus* and directed the Commonwealth to commence a new trial.

## B.

After the case returned to the trial court, Weiss filed a motion seeking to bar retrial under our state Constitution's double jeopardy clause based on Attorney Robinette's prosecutorial misconduct. At the hearing on the motion, Attorney Robinette remained steadfast in his insistence that he never intended to violate ***Brady***[1] or withhold impeachment evidence. He contended that he believed at the time that the letters and phone calls he made on behalf of Tribuiani and Wright were not the type of consideration that needed to be

_____

[1] ***Brady v. Maryland***, 373 U.S. 83 (1963) (requiring prosecutors to disclose exculpatory evidence material to guilt or punishment upon defendant's request).

disclosed.[2]  In assessing the intentionality of the misconduct, the trial court credited Attorney Robinette's testimony, albeit somewhat reluctantly.  ***See id.*** at 29 ("[T]his [c]ourt believes that Robinette genuinely thinks that his actions did not and do not constitute prosecutorial misconduct. . . .  The [c]ourt finds Robinette's convictions regarding his conduct to be extremely flawed and troubling, but not impossible to believe."); *id.* at 31 (describing Attorney Robinette's rationalizations as "seriously flawed, but not impossible to believe" and "erroneous and troubling"); *id.* at 32 (describing his actions as "more consistent with a prosecutor who possessed the unenviable pairing of arrogance and ignorance").  Thus, it concluded no intentional misconduct barred retrial.

Following our remand, the trial court analyzed the record for reckless prosecutorial misconduct in accordance with the newly-decided ***Commonwealth v. Johnson***, 231 A.3d 807 (Pa. 2020).  It held that much of Attorney Robinette's conduct was based on a negligent misunderstanding of the law.  *Id.* at 38.  It identified one area in which it believed Attorney Robinette's conduct rose to the level of recklessness:

> However, the [c]ourt finds Robinette's conduct to be reckless with regard to the statement that he would convey the nature and

---

[2] Attorney Robinette had gone so far as to testify previously at the PCRA hearing that he did not consider Tribuiani and Wright's testimony or credibility at trial to be important "in the big scheme of things," an assertion that the PCRA court described as "truly preposterous."  N.T., 3/30/07, at 117.

extent of Wright's and Tribuiani's cooperation "whenever queried regarding the same."

As stated above, when questioned about the fact that he wrote favorable letters or made favorable phone calls at the request of the cooperating witness, Robinette responded as follows:

"I was asked by Mr. Tribuiani to help him contact the people who might have an opportunity to comment on his pre-release. Query is a word that's being used as it to query, being synonymous with to ask and that's the way I was using the word."

The [c]ourt finds that decisions made based upon this barely believable explanation were made with a conscious disregard to the result.

*Id.* (citation omitted, cleaned up). Nevertheless, it concluded that Attorney Robinette's misconduct "[did] not deal with the key piece of physical evidence leading to the defendant's conviction," distinguishing the matter from *Johnson*. *Id.* at 39 (footnote omitted). Thus, even though Attorney Robinette "was reckless in his decision not to disclose the phone calls and letters," the trial court concluded that "this reckless decision did not carry with it a substantial risk that Weiss would be denied a fair trial." *Id.*

## II.

## A.

I begin with *Johnson*, as this Court previously remanded to the PCRA court to consider the impact of that decision on this case. There, the Commonwealth and its witnesses made the "unimaginable" error of conflating two pieces of physical evidence—two baseball hats, one with the victim's blood and one with the defendant's DNA—into one hat, arguing to the jury that the

defendant's hat must have been splattered with the victim's blood when he committed the shooting. *Id.* at 827. After the defendant was granted a new trial during PCRA[3] proceedings, he filed a motion to bar retrial based on the prosecution's misconduct. The trial court denied the motion, finding that the Commonwealth's recklessness in the original proceedings was not the type of intentional misconduct or bad faith that bars retrial. *Id.* at 815-16.

> On review, our Supreme Court held:
>
> Under Article I, Section 10 of the Pennsylvania Constitution, prosecutorial overreaching sufficient to invoke double jeopardy protections includes *misconduct which not only deprives the defendant of his right to a fair trial, but is undertaken recklessly, that is, with a conscious disregard for a substantial risk that such will be the result*. This, of course, is in addition to the behavior described in [***Commonwealth v. Smith***, 615 A.2d 321 (Pa. 1992)], relating to tactics specifically designed to provoke a mistrial or deny the defendant a fair trial. In reaching our present holding, we do not suggest that all situations involving serious prosecutorial error implicate double jeopardy under the state Charter. To the contrary, we bear in mind the countervailing societal interests mentioned above regarding the need for effective law enforcement . . . and highlight again that, in accordance with long-established double-jeopardy precepts, retrial is only precluded where there is prosecutorial *overreaching* – which, in turn, implies some sort of conscious act or omission.

*Id.* at 826 (first emphasis added, citation omitted). In distinguishing prosecutorial overreaching from other forms of error, the Court explained "overreaching signals that the judicial process has fundamentally broken down because it reflects that the prosecutor, as representative of an impartial

---

[3] 42 Pa.C.S. §§ 9541 *et seq*.

sovereign, is seeking conviction at the expense of justice," which is "the very type of 'tactic which the double jeopardy clause was designed to protect against.'" ***Id.*** at 824 (quoting ***Commonwealth v. Starks***, 416 A.2d 498, 500 (Pa. 1980)).

In ***Commonwealth v. Sanchez***, 262 A.3d 1283 (Pa. Super. 2021), which the majority posits is analogous to the instant case, neither the prosecution nor the investigating officers received the exculpatory DNA test results until *after* the defendant had been convicted and sentenced to death. Neither entity even knew that the relevant fingernail clippings had been submitted to a laboratory for testing; rather, the laboratory performed the testing without the express request of the officer. ***Id.*** at 1293. Following an evidentiary hearing, the trial court found that the Commonwealth disclosed the report to the defense immediately after receiving it and that the lapse in communication was merely inadvertent and not the result of a conscious disregard of the defendant's right to a fair trial. Additionally, unlike ***Johnson***, the oversight did not result in false evidence or testimony being admitted at trial. We credited the trial court's credibility determinations and agreed that the late disclosure of the DNA report merited a new trial but was not the result of prosecutorial overreaching that would compel dismissal of the charges. ***Id.*** at 1294; ***see also Commonwealth v. King***, 271 A.3d 437, 449 (Pa. Super. 2021) (finding that retrial was not barred when prosecutor did not disclose

exculpatory letter because he did not know that it had been written prior to the author's arrest).

**B.**

I do not agree that **Johnson** is distinguishable or encompasses substantially more egregious misconduct than the instant case, and, in any event, I would not find that our Supreme Court intended to create a standard that only misconduct on the same level as that in **Johnson** could meet. I do not hesitate to conclude that Attorney Robinette's reckless misconduct here rose to the level of prosecutorial overreaching that deprived Weiss of his right to a fair trial and was borne of a desire to "seek[] conviction at the expense of justice." **Johnson**, **supra**, at 824. While the trial court distinguished **Johnson** in part because the instant case did not rest on "a key piece of *physical* evidence," that difference is not dispositive. Trial Court Opinion, 6/10/21, at 39 (emphasis added). The Commonwealth clearly believed at the time of trial that Tribuiani and Wright's testimony was integral to securing Weiss's conviction. By failing to disclose the assistance it had extended to those witnesses before trial, it prevented the defense from cross-examining them on their motives and prevented the jury from considering vital information that very well could have affected its assessment of their testimony. I believe this recklessness is on par with that in **Johnson**.

In the PCRA proceedings, Attorney Robinette attempted to downplay the significance of Tribuiani and Wright's testimony in securing Weiss's conviction. The fact remains, however, that his office had previously withdrawn the homicide charge against Weiss in the 1980s based on lack of sufficient

evidence to proceed, and as late as 1995, the office explained to the PSP that it was not confident that it could obtain a conviction based on the existing evidence. It was only after it obtained the jailhouse confessions from Tribuiani and Wright that the Commonwealth had the confidence to seek a conviction and the death penalty for Bruzda's murder. In that context, Tribuiani and Wright's credibility on the stand cannot be understated. Attorney Robinette knew as much, but nonetheless failed to disclose valuable impeachment material to the defense. I cannot view this as anything less than a "conscious disregard for a substantial risk" that Weiss would be denied a fair trial. *Johnson*, *supra*, at 826.

Indeed, the trial court recognized the egregiousness of this prosecutorial overreach when it concluded that Attorney Robinette's conduct was reckless. It found that he elected not to disclose the letters and phone calls he made on behalf of Tribuiani and Wright prior to trial, even when specifically asked about any "deals" or "understandings" at a pre-trial hearing. In his letter to defense counsel and when asked in open court, he disclosed only that "the Commonwealth will only report the nature and extent of the witnesses' cooperation whenever queried regarding the same." Trial Court Opinion, 6/10/21, at 11.

Attorney Robinette attempted to argue that his representation about the agreements with the witnesses was accurate because Tribuiani himself asked for assistance with pre-release, rendering it a "query" within the meaning of

his disclosure. As the trial court concluded, this explanation flies in the face of a plain reading of that language. The letter implied that Attorney Robinette would respond truthfully when asked by an outside agency, such as the PBPP or another prosecuting office, about the extent of Tribuiani or Wright's cooperation. It does not suggest that he was referring to "queries" from the witnesses themselves—such a "query" is precisely the type of negotiation for a "deal" or "understanding" that the defense was concerned with in making its request for impeachment material. Moreover, the well-documented chain of events shows that Attorney Robinette made overtures on behalf of Tribuiani and Wright months prior to the above disclosure, but nevertheless kept that information from defense counsel and the court.[4]

Additionally, I note that the **Johnson** Court concluded that the Commonwealth's conduct constituted prosecutorial overreaching based on "reckless disregard for consequences and for *the very real possibility of harm* stemming from the lack of thoroughness in preparing for a first-degree murder trial." **Johnson**, **supra**, at 827 (emphasis added). It explained that the

---

[4] While Attorney Robinette testified that he did not believe that this evidence was considered **Brady** material at the time, this understanding was plainly erroneous. **See Commonwealth v. Strong**, 761 A.2d 1167, 1171 (Pa. 2000) (citing **Napue v. Illinois**, 360 U.S. 264, 269 (1959)) ("Exculpatory evidence also includes evidence of an impeachment nature that is material to the case against the accused."). While **Strong** was decided in 2000, the Supreme Court considered whether **Brady** was violated "in accordance with the status of the law at the time of appellant's trial in 1984." **Id.** at 1171 n.4.

- 16 -

resultant harm "comprises the risk of an erroneous conviction, years spent on death row, and potential execution predicated on a fundamentally flawed trial. The harm in this case also includes substantial resources expended in years of post-conviction proceedings and in litigating the current pre-trial motion to dismiss." *Id.* at 827 n.15. These same injuries have, in fact, resulted here, as Weiss was convicted and sentenced to death in 1997 after he was unable to confront vital witnesses with evidence impeaching their motives for testifying. His case has been winding its way through the state and federal courts since his conviction and now, 25 years later, has yet to reach a resolution.

Finally, I find *Sanchez* and *King* easily distinguishable from the instant matter. In both cases, the trial court concluded that the prosecuting attorney was unaware of exculpatory evidence at the time of trial.[5] These matters represent simple factual disputes about the prosecuting attorney's knowledge that were resolved in favor of the Commonwealth by the trial court, and it was outside the province of this Court to second-guess those findings when they were supported by the record. *See Commonwealth v. Kearns*, 70 A.3d

---

[5] In *Sanchez*, the evidence in question was a pending DNA test that the prosecutor did not know had been submitted to the lab, and in *King*, the evidence was the date an exculpatory letter had been authored by a key witness, as well as another witness's cooperation agreement with the federal government. *See Commonwealth v. Sanchez*, 262 A.3d 1283, 1293 (Pa. Super. 2021); *Commonwealth v. King*, 271 A.3d 437, 449, 451 (Pa. Super. 2021).

881, 884 (Pa. Super. 2013). Here, the trial court viewed Attorney Robinette's testimony at the hearing on the double jeopardy motion and concluded that his behavior was reckless and his *post hoc* rationalizations strained credulity. Its factual findings are well-supported by the record. As explained *supra*, I simply disagree with the legal conclusion that the misconduct here was distinguishable from that in **Johnson** and did not carry the risk of depriving Weiss of a fair trial.

For the foregoing reasons, I would conclude that the Commonwealth's misconduct in litigating Weiss's trial in 1997 was sufficiently egregious that Article 1, Section 10 of the Pennsylvania Constitution should bar retrial.

Accordingly, I respectfully dissent.