J-S30030-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| NAFEES JORDAN, | : | |
| | : | |
| Appellant. | : | No. 3436 EDA 2017 |

Appeal from the Judgment of Sentence, September 25, 2017,
in the Court of Common Pleas of Philadelphia County,
Criminal Division at No(s): CP-51-CR-0005373-2016.

BEFORE: PANELLA, P.J., KUNSELMAN, J., and MUSMANNO, J.

MEMORANDUM BY KUNSELMAN, J.:            **FILED AUGUST 08, 2019**

Nafees Jordan appeals from the judgment of sentence imposed after a jury convicted him of intimidating a witness/victim and possession of an instrument of crime.[1]  Immediately following the jury trial, the trial court found him guilty of persons not to possess a firearm.[2]  On appeal, Jordan challenges three of the trial court's evidentiary rulings.  We affirm.

The trial court summarized in detail the bizarre facts of this case as follows:

> The victim is Jarrod Melvin ("Jarrod"), who began classes in 2014 as a freshman at Temple University ("Temple").  He was 18 years' old and resided in off-campus housing at The View apartment building, which is located near Temple's campus in the city and county of Philadelphia, Pennsylvania.

_____

[1] 18 Pa.C.S.A. §§ 4952(a)(1) and 907, respectively.

[2] 18 Pa.C.S.A. § 6105(a)(1).

When Jarrod first moved into his 12th floor apartment, he had three roommates – Isiah Bounds, David Ortiz, and Brian Robinson. Their apartment had two bedrooms, each containing two beds and a bathroom. There was a "big common area in the middle of the apartment" that contained a stove and other amenities. Jarrod roomed with Isiah Bounds ("Isiah"), with whom he had attended the same high school. [Jordan], whom Jarrod first met in the Fall of 2014, is Isiah's cousin.

In January or February of 2015, Jarrod arrived home to his shared apartment and encountered [Jordan] arguing with Isiah about money. [Jordan] asked Jarrod if he knew "anything about why there's money missing" and if he had "stolen anything from any of the roommates." Unaware of what [Jordan] was talking about, Jarrod said "no." Jordan responded by threatening Jarrod by asking him if he knew that he [(Jordan)] could kill him. Jarrod described [Jordan] as being only a foot away from him and very aggressive. Jarrod believed [Jordan] was capable of such an act and was honestly scared that [he] would be killed.

[Jordan] then proposed that he, his girlfriend Lashonda Chandler ("Lashonda"), and Lashonda's two young daughters move into Jarrod's apartment and that would settle the argument over the money. [Jordan] never asked Jarrod for permission to move into the premises and Jarrod was "scared" at the prospect of [Jordan's] resolution. Nevertheless, [Jordan] stayed in the apartment that very night, and about three days later Lashonda moved in with her 3-year-old and 4-year-old daughters.

By the time [Jordan] and Lashonda moved in, Jarrod's roommate, David Ortiz, had already moved to another apartment. Jarrod's other roommate, Brian Robinson, moved out around a month after [Jordan] moved in. Jarrod and Isiah thereafter lived in one bedroom while [Jordan], Lashonda, and her children lived in the other bedroom. After effectively taking over the apartment, [Jordan] told Jarrod that he could no longer have his friends come over because it would be "bad for their safety." Again, Jarrod believed the threat and told his friends to stay away.

[Jordan] and Lashonda lived in Jarrod's apartment from February 2015 until the end of August 2015. During

Temple's summer session classes, Isiah moved out because he failed to pay his rent. Jarrod temporarily received two new roommates who stayed in one bedroom while [Jordan] and Lashonda stayed in the other bedroom. Jarrod, meanwhile, slept on the couch in the apartment's common area.

Despite being relegated to the couch in his own apartment, Jarrod believed [Jordan's] repeated assurances that he and Lashonda were trying to find another apartment. Eventually the lease expired and management refused to renew it because there were people who weren't on the lease staying in the room. Upon learning he could not renew his lease at The View, Jarrod began searching for other off-campus student housing.

Trial Court Opinion, 1/11/19, at 2-4 (citations omitted). Although Jarrod found a new place to live while attending Temple University, Jordan's conduct toward him followed him. As the trial court explained:

In August 2015, Jarrod moved into "The Edge" apartment building located at 1601 North 15th Street. Jarrod's 9-month lease required rental payments of $725.00 per month, which his mother paid. On Jarrod's first day at the new apartment, [Isiah] and two other friends visited him. A few days later, [Jordan] called Jarrod and asked him if he and Lashonda could visit. Either that day or the next, [Jordan] visited Jarrod's new apartment with Lashonda and her two kids.

[Jordan] and Lashonda toured Jarrod's new apartment and asked eventually if they could stay for the night. Jarrod acceded because he "didn't feel that he could have said no" and didn't think they would actually listen to him anyway. The following morning, Jarrod heard Lashonda arguing with someone on the telephone and was told by [Jordan] that their new apartment was not going to work out. [Jordan] and Lashonda therefore again stayed overnight at Jarrod's apartment, this time sleeping in Jarrod's bed while Jarrod slept on the floor. Jarrod believed he would "be met with either violence or threats" if he refused [Jordan's] request to stay. [Jordan] and Lashonda soon moved in with their

- 3 -

possessions. About one month later, [Jordan] took Jarrod's key cards required for entering the apartment.

[Jordan], Lashonda, and her children stayed in Jarrod's second apartment from August 2015 until May 2, 2016. While [Jordan] and Lashonda slept in his bed during this period, Jarrod slept in the building's community areas and at [Isiah's] mother's house.

In February, 2016, while in the apartment, [Jordan] showed Jarrod his gun, which Jarrod took to be a threat. [Jordan] did not verbally threaten Jarrod at that time.

Remarkably, in addition to occupying Jarrod's second apartment, [Jordan] and Lashonda told Jarrod to register for Child Care Information Services (CCIS) and misrepresent that he was a child care provider for Lashonda's children. Jarrod was required to write an attendance [letter] for [Lashonda's] children saying he was taking care of them five days a week from January 2016." In exchange for registering for CCIS, Jarrod received monthly subsidy checks for around $400.00, which he gave to [Jordan] until about April of 2016. [Jordan] also directed Jarrod to open a bank account so that CCIS checks could be directly deposited into the account. The account was opened under Jarrod's name but [Jordan] and Lashonda took possession of Jarrod's debit card. For the entire duration of the account, Jarrod withdrew only $100.00 for his personal use, when he transferred money into his *PayPal* account.

Jarrod testified that in February 2016 [his] *PayPal* transaction caused his bank account to be [overdrawn]. Because of the overdraft, the bank allocated part of the monthly CCIS check to compensate for the balance. Upon discovering the overdraft, [Jordan] followed through with his threats of violence. He punched Jarrod several times and then stuck a gun into his mouth and threatened to kill him. [Jordan] threatened that if Jarrod told anyone about the incident or went to the police, he would kill Jarrod. Lashonda videotaped the entire incident with her cell phone.

[Jordan] additionally told Jarrod to register a vehicle under his name and purchase automobile insurance. Lashonda had paid for the vehicle, but neither she nor [Jordan] possessed a driver's license and thus they could not register the automobile. [Jordan] told Jarrod that he

- 4 -

had to drive the car on certain situations [sic] because they did not have their licenses so they would not get in trouble for having a car.

Moreover, while [Jordan] was not himself employed he instructed Jarrod to find a job to help [Jordan] and Lashonda get their own apartment and move out eventually. With the help of [Jordan's] cousin, Rafi Johnson, Jarrod therefore obtained employment as an attendant for Germantown Taxicab Company. Jarrod did not want the job, missed numerous classes because of the time it consumed, and only took the job because he had been "physically threatened by [Jordan] and also because [he] was somewhat hopeful that they would be able to get their own place and [he] wouldn't have to deal with them ever again."

Finally, while Jarrod was driving the car with [Jordan], Jarrod backed into the vehicle behind him, prompting [Jordan] to punch him several times in the face. On another occasion in April 2016, while Jarrod was driving to his first day of work with [Jordan] in the passenger seat, [Jordan] struck Jarrod with an open hand because Jarrod failed to check in with his new employer. [Jordan] then asked Jarrod "which one of [his] family members did [he] want to die . . . [a]nd waited for [Jarrod] to answer the question." Although Jarrod intended to spend that very next weekend with his family members, [Jordan] told him that he couldn't go because his parents would see his swollen face from the beating.

Trial Court Opinion, 1/11/19, at 4-6 (citations and footnotes omitted). Jordan's influence on Jarrod finally came to end in the next month, which, after an investigation by local authorities, ultimately resulted in Jordan's arrest. As the trial court explained:

A couple weeks later, on May 1, 2016, Jarrod finally went home. When his parents asked how school was going, Jarrod didn't answer. He had missed his final exams for the second semester and was failing his classes. While trying to think of an excuse for his failing grades, Jarrod broke down and told his parents what occurred over the previous

- 5 -

months. Jarrod had not previously told his parents about his situation with [Jordan] because he was scared for his life and the lives [of] his family members.

Philadelphia Police Officer John Gangloff ("Officer Gangloff") testified that Jarrod and his parents presented to police headquarters on the evening of May 1, 2016. Jarrod informed Officer Gangloff that [Jordan] had taken over his apartment, stolen his identity, and threatened to shoot and kill him. Officer Gangloff sent Jarrod to Central Detectives where he was interviewed by Detective Michael Sweeney in the early morning of May 2, 2016. That same morning around 6:00 a.m., Detective Sweeney and fellow officers executed a search warrant for Jarrod's apartment, inside which they found [Jordan], Lashonda, and Lashonda's two daughters. The officers' search yielded a loaded handgun, bank statements, "CCIS paperwork," Lashonda's cell phone, car keys, and a "swipe card" for the premises.

Pursuant to another search warrant, Detective Sweeney submitted Lashonda's cell phone to the district attorney's office which recovered and preserved the video from February 2016 that showed [Jordan] sticking a handgun into Jarrod's mouth and threatening to kill him.

Trial Court Opinion, 1/11/19, at 7-8 (citations and footnote omitted).

Finally, the trial court summarized Jordan's defense case as follows:

In his defense, [Jordan] presented the testimony of several of his cousins, including Fatima Johnson, Warren Johnson, Rafi Johnson, and [Isiah]. All of these witnesses testified that they were friends with [Jordan], socialized with [Jordan] and Jarrod, had visited Jarrod's apartment(s), and had never observed Jarrod in distress while in the company of [Jordan]. These witnesses testified that Jarrod and [Jordan] always behaved as though they were friends.

*Id.* at 8 (citation and footnote omitted).

Based on the above facts, Jordan was convicted of the aforementioned charges. Although he was also charged with aggravated assault, robbery,

burglary, theft, and criminal conspiracy, the Commonwealth did not move on the assault charge at trial, and the jury acquitted him of the other charges. *See* Trial Court Opinion, 1/11/19 at 1. This timely appeal followed. Both Jordan and the trial court have complied with Pa.R.A.P. 1925.

As noted above, Jordan challenges three of the trial court's evidentiary rulings. He presents these claims as follows:

1. Did the trial court commit an abuse of discretion in sustaining an objection to a question asking why [Jordan] placed a gun in [Jarrod's] mouth because the response sought would not have involved inadmissible hearsay but rather admissible evidence and even if the response would have involved [hearsay] it was admissible because the Commonwealth opened the door to that area of inquiry?

2. Did the trial court commit an abuse of discretion in overruling an objection asking a police detective whether he believed [Jarrod] and whether he thought that [Jarrod] was telling the truth when the detective interviewed [Jarrod]?

3. Did the trial court commit an abuse of discretion in overruling an objection to [the closing argument] made by the prosecutor because he asked the jury to place itself in [Jarrod's] shoes and personalized the case by saying that he could not have endured what [Jarrod] endured?

*See* Jordan's Brief at 3 (excess capitalization omitted). We will address these claims in the order presented.

Jordan's first two claims involve the admissibility of evidence. "Questions regarding the admission of evidence are left to the sound discretion of the trial court, and we, as an appellate court, will not disturb the trial court's

rulings regarding the admissibility of evidence absent an abuse of that discretion. **Commonwealth v. Pukowsky**, 147 A.3d 1229, 1233 (Pa. Super. 2016). "In general, relevant evidence, *i.e.,* evidence that logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable, or supports a reasonable inference or presumption regarding a material fact, is admissible." **Commonwealth v. Wilson**, 147 A.3d 7, 15 (Pa. Super. 2016) (citation omitted).

Jordan's first issue arose at trial during the Commonwealth's cross-examination of Rafi Johnson who, on direct, testified that Jordan and the victim were on friendly terms during the entire time period at issue. Johnson maintained this characterization of the relationship even after Jordan showed him the February 2016 video. On cross-examination, the following exchange occurred:

Q. You thought they were friends?

A. I knew they were friends.

Q. Have you seen the video, in this case, sir?

A. Say that again.

Q. Have you seen the video that was recovered from [Lashonda's] phone in this case?

A. Yes.

Q. You have? When did see it, sir?

A. (No response.)

Q. When did you see the video?

A. (No response.)

N.T., 7/14/17, at 95.  The trial court overruled defense counsel's objection that the prosecutor was being argumentative.  The exchange then continued as follows:

> Q.  Sir, I'm very interested in knowing when you would have seen the video in this case.
>
>   Do you understand my question?
>
> A. (No response.)
>
>   THE COURT:  You need to answer.
>
>   [JOHNSON]:  Where did I see the video?
>
>                     -  -  -
>
> [BY THE PROSECUTOR]:
>
> Q. When?
>
> A. I don't know.
>
> Q. Well, it was before it was recovered in this case on May 1, 2016.  It would have had to have been.
>
>   Who showed you the video, sir?
>
> A. Who showed me the video?
>
> Q. Correct.
>
> A. [Jordan] did.
>
> Q. He did.  And tell us about that.
>
>   What was the contexts [sic] of [Jordan] showing you the video of him putting a gun in someone else's mouth?
>
> A. Who do you mean in contact [sic]?
>
> Q. Were you laughing about it?
>
> A. No.
>
> Q. Was there anything funny about the video, sir?
>
> A. No.  At the end of the day, no.

Q. And had you seen the video of [Jordan] putting the gun in [Jarrod's] mouth before or after you offered [Jarrod] the job at the taxi cab company?

A. I don't remember. I honestly don't remember that, but yeah - - I don't remember.

Q. So you came into court today after seeing the video of [Jordan] putting a gun in [Jarrod's] mouth and you still said that [Jordan] and [Jarrod] were friends?

A. Yeah because at the end of the day, [Jordan] told me why he did it.

Q. Sir, have any of your friends ever put a gun in your mouth and threatened to kill you?

A. No.

[THE PROSECUTOR]: I don't have any other questions.

THE WITNESS: [Jordan] took the gun from [Jarrod].

N.T., 7/14/17, at 95-97.

On redirect, the following exchange occurred:

[BY DEFENSE COUNSEL]:

Q. When you say [Jordan] told you why he did it, tell him what happened?

[THE PROSECUTOR]: Objection. Calls for - -

THE COURT: Sustained.

[DEFENSE COUNSEL]: Judge, he opened the door.

THE COURT: Hold on. Hold on. Do not answer until I -

THE WITNESS: I just answered all his questions.

THE COURT: You need to not answer if there's an objection until I rule on the objection, sir. That's how the rules work. I'm sustaining the objection.

[BY DEFENSE COUNSEL]: Can you finish your answer?

THE COURT: I sustained the objection so that means he cannot finish.

[DEFENSE COUNSEL]: You're not going to allow him to finish his answer - -

THE COURT: That's correct.

[DEFENSE COUNSEL]: - - in response to the question?

THE COURT: That's correct. Don't argue with me, Counsel.

[DEFENSE COUNSEL]: Just note my objection that you're cutting me off on redirecting this witness when [the prosecutor] opened the door.

THE COURT: Your objection is noted.

[DEFENSE COUNSEL]: Fine. I have no further questions.

N.T., 7/14/17, at 97-98.

Jordan argues that, because of the trial court's erroneous ruling, he "suffered reversible error." Jordan's Brief at 18. According to Jordan:

> The law clearly permitted counsel to ask the disallowed question because the response sought would not have contained hearsay and even if it would have, the Commonwealth had opened the door to the area of inquiry thereby allowing the defense to ask the question. [Defense] counsel's questioning on re-direct examination was, indeed, "a fair response" to the Commonwealth's questions on cross-examination, as the excluded evidence was both relevant and admissible to demonstrate that the incident depicted on the cell phone video between [Jordan] and [Jarrod] was not adversarial at all.

*Id.* This claim does not warrant relief for a number of reasons.

Initially, we agree with the Commonwealth's assertion that Jordan did not adequately preserve this claim. **See** Commonwealth's Brief at 11. A party

preserves a claim that the trial court erred in excluding evidence only when "a party informs the court of its substance by an offer of proof, unless the substance was apparent from the context." Pa.R.E. 103(a)(2). Jordan made no such proffer, and the substance of Jordan's proposed response was not apparent. Although in his brief, Johnson proffers two alternative responses to his counsel's question, in order to preserve the claim, Jordan had to make this proffer at the time of the Commonwealth's objection. *See Commonwealth v. Parker*, 847 A.2d 745, 749-750 (Pa. Super. 2004) (holding defendant waived objection to Commonwealth witness' testimony when he did not raise his objection until after both parties rested).

Notwithstanding waiver, we agree with the trial court's conclusion that it properly sustained the Commonwealth's objection because Johnson's response would have been inadmissible hearsay. "[H]earsay is an out-of-court statement offered for the truth of the matter asserted and is inadmissible unless it falls within an exception to the hearsay rule." *Commonwealth v. Manivannan*, 186 A.3d 472, 482 (Pa. Super. 2018). Jordan contends that the answer to his counsel's question did not call for a hearsay response because "the question asked Johnson 'what happened' and not what [Jordan] may have said while screening the video." Jordan's Brief at 19. We disagree. Because Johnson was not present when Lashonda recorded the video on her phone, he could only know "what happened" by what Jordan told him. As the trial court explained:

> The only conceivable relevance of [Jordan's] out-of-court statements would be to establish that [Jordan's] conduct was justified or excused. To possess evidentiary value, [Jordan's] purported declarations depended on the truth of [Jordan's] explanation for the videotaped incident, and they therefore were hearsay.

Trial Court Opinion, 1/11/19, at 11 (footnote omitted). It was within the trial court's discretion to infer that counsel's question called for a hearsay response. *Pukowsky*, *supra*.

In addition, the Commonwealth did not "open the door" to defense counsel's inquiry. A litigant opens the door to the introduction of otherwise inadmissible evidence "by presenting proof that creates a false impression refuted by otherwise prohibited evidence." *Commonwealth v. Nypaver*, 69 A.3d 708, 716 (Pa. Super. 2013). The Commonwealth did not create a false impression regarding the video at issue. As seen in the above exchanges, although the Commonwealth asked Johnson about the context in which Jordan showed him the video, Johnson did not respond. N.T., 7/14/17, at 96. Further, the Commonwealth did not ask additional questions once Johnson stated that Jordan told him "why he did it." N.T., 7/14/17, at 97. Instead, Johnson later gave an unsolicited response that Jordan told him that Jordan had taken the gun from Jarrod. N.T., 7/14/17, at 97. With this response, the Commonwealth did not "open the door" thereby permitting defense counsel to ask additional questions based on Johnson's initial hearsay response.

Finally, Jordan does not explain how, given all the other evidence, including Jarrod's testimony concerning the video, and the display of the video

to the jury on more than one occasion, resulted in "reversible error." "To constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party." **Manivannan**, 186 A.3d at 480 (citation omitted). Jordan has not made such a demonstration. Thus, for all of these reasons, Jordan's first issue fails.

In his second issue, Jordan claims that he is entitled to a new trial because the trial court abused its discretion, when, on redirect, the court permitted the prosecutor to ask the police detective who interviewed Jarrod whether he believed Jarrod was telling the truth when he described Jordan's actions toward him.

Detective Michael Sweeney interviewed Jarrod when he came into Central Detectives on May 2, 2016. When called as a witness by the Commonwealth, Detective Sweeney detailed various statements Jarrod made about Jordan's interactions with him during the sixteen-month period in question. Detective Sweeney also testified that he subsequently learned of the cell phone video.

On cross-examination, defense counsel explored with the detective what attempts he made to corroborate Jarrod's statements before seeking the search warrant for Jarrod's apartment and learned there were little to no efforts expended. At one point, Detective Sweeney agreed with defense counsel's statement "after [he] saw the video . . . [he] just went with this case[.]" N.T., 7/13/17, at 160. The following exchange then occurred:

[BY DEFENSE COUNSEL]:

- 14 -

Q. I understand. So you gave the statement [sic]. You know sometimes when people give statements, they don't always tell the truth, right?

A. Yes.

Q. Right?

A. Yes.

Q. So you just believed this, even though sometimes, you know, when people give a statement they sometimes don't give the full truth, right?

A. It happens.

N.T., 7/13/17, at 172-73.

On redirect, after going over Jordan's statement, the prosecutor referred back to defense counsel's cross-examination. The following exchange then occurred:

[BY THE PROSECUTOR]:

Q. On cross-examination defense [counsel] asked you, Sometimes [sic] people lie in statements; correct?

A. Yes.

Q. When [Jarrod] told you this story on May 2, 2016, at around 1:00 a.m., did you believe him?

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

[DEFENSE COUNSEL]: It's for the jury.

THE COURT: Overruled.

[BY THE PROSECUTOR]:

Q. Why?

A. The detail.

- 15 -

N.T., 7/13/17, at 180-81.

In support of his claim of reversible error, Jordan asserts "[u]nder Pennsylvania jurisprudence, the issue of whether a witness is telling the truth or not is a jury function." Jordan's Brief at 23 (citing **Commonwealth v. Lee**, 956 A.2d 1024, 1029 (Pa. Super. 2008)). In addition, he contends, "a party may not present opinion evidence as to whether or not a witness's testimony is credible, as this intrudes on the fact-finder's province." **Id.** (citing **Commonwealth v. Smith**, 567 A.2d 1080, 1082 (Pa. Super. 1989), and **Commonwealth v. Seese**, 517 A.2d 920, 922 (Pa. 1986)). According to Jordan, "Such testimony is never proper, and for the [trial court] to have allowed the testimony was nothing but error poisoning a fundamental aspect of a criminal trial: the trial by jury." Jordan's Brief at 25. He further argues:

> The Commonwealth used the detective to instruct the jury that [Jarrod] was a person whom they should believe. In the context of this case, such commentary was unassailable by the defense because of the fact that the opinion that [Jarrod] was believable and truthful came from a police detective who by his position and title lent an imprimatur of infallibility to the opinion he rendered. As such the ruling by the trial court deprived [Jordan] of a fair trial.

**Id**.

While we do not disagree with Jordan's statement of Pennsylvania law, we also agree with the trial court that Detective Sweeney's otherwise inadmissible opinion testimony properly was admitted. As the trial court explained:

- 16 -

> The questioning on re-direct was substantially the same line of questioning elicited by defense counsel on cross-examination, where defense counsel examined Detective Sweeney regarding why he believed the statement that Jarrod provided. Accordingly, defense counsel opened the door to the redirect testimony at issue, and [Jordan's] claim of error is baseless.

Trial Court Opinion, 1/11/19, at 13. Here, defense counsel's questioning left the juror's with the false impression that Jarrod was not telling Detective Sweeney the entire truth. **Nypaver**, **supra**.[3]

We further agree with the trial court's conclusion that, to the extent any error occurred in permitting Detective Sweeney's response to a single question, any error was harmless. As the trial court further explained:

> Furthermore, even if the redirect testimony was erroneously admitted, no relief is merited. "[N]ot all errors at trial entitle an appellant to a new trial, and the harmless error doctrine, as adopted in Pennsylvania, reflects, the reality that the accused is entitled to a fair trial, not a perfect trial." **Commonwealth v. Watson**, 945 A.2d 174, 177 (Pa. Super. 2008) (citations omitted). "Harmless error exists when: (1) the error did not prejudice the defendant or the prejudice was *de minimus*; or (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted

---

[3] Interestingly, although Jordan relied on the Commonwealth "opening the door" as a basis for relief in his first issue, as to this finding by the trial court as to his second issue, Jordan argues that "the 'fair response' doctrine has been the subject of much abuse, has been properly criticized as promoting prosecutorial 'lawlessness,' and should be abandoned. Jordan's Brief at 27. As Jordan cites no authority for these statements, we do not address them further. **See Commonwealth v. Tielsch**, 934 A.2d 81, 93 (Pa. Super. 2007) (holding that undeveloped claims will not be considered on appeal).

evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error so insignificant by comparison that the error could not have contributed to the verdict." *Id.*

The challenged testimony was "merely cumulative" of the testimony that defense counsel elicited on cross-examination, and its admission therefore was harmless. Moreover, the jury convicted [Jordan] of intimidating [Jarrod] and possessing an instrument of crime. Since there was chilling videotape evidence of [Jordan] sticking a gun into Jarrod's mouth and threatening to kill him if he disclosed the abuse to anyone, the evidence of guilt "was so overwhelming and the prejudicial effect of the [alleged] error so insignificant by comparison that the error could not have contributed to the verdict." [*Watson*,] *supra*.

Trial Court Opinion, 1/11/19, at 13.

In addition, we note that, given Jordan's acquittal of other charges, including robbery and burglary, Detective Sweeney's opinion of Jordan's truthfulness did not unduly affect the jury's deliberations. Thus, for all of the above reasons, Jordan's second issue fails.

Jordan's third issue involves a claim of prosecutorial misconduct. Our standard of review is well settled:

[P]rosecutorial misconduct does not take place unless the unavoidable effect of the comments at issue was to prejudice the jurors by forming in their minds a fixed bias and hostility toward the defendant, thus impeding their ability to weigh the evidence objectively and render a true verdict. . . . In reviewing a claim of improper prosecutorial comments, our standard of review is whether the trial court abused its discretion. When considering such a claim, our attention is focused on whether the defendant was deprived of a fair trial, not a perfect one, because not every inappropriate remark . . . constitutes reversible error.

- 18 -

*Commonwealth v. Noel*, 53 A.3d 848, 858 (Pa. Super. 2012) (citations omitted). "Prosecutorial misconduct, however, will not be found where the comments were based on evidence or proper inferences therefrom or were only oratorical flair." *Commonwealth v. Harris*, 884 A.2d 920, 927 (Pa. Super. 2005) (citation omitted). In order to evaluate whether comments were improper, we must look to the context in which they were made. *Id.*

The remark Jordan challenges came at the beginning of the prosecutor's closing. Read in context, it was as follows:

> Ladies and gentlemen, during this week, we've all heard the horrific details of what two people this defendant [Jordan] and Lashonda Chandler, did to an 18-year-old kid who left home and went to college and was living by himself for the first time in his life. And as tough as it was to sit here and listen to Jarrod for two days go through all the details of what happened to him and what they did to him, and as difficult as it was to watch that video and to see the violence he endured, it does not compare to what he actually went through. It doesn't even come close. He went through this for over a year. Over a year.
>
> When you receive the evidence in this case, you receive it in this courtroom. It's a nice bright courtroom. It's filled with professionals. Everyone is polite. People are wearing suits. There's a Judge making sure we all stay in line. There's sheriffs making sure we're all safe. ***And it has to be that way because if you allowed yourselves to actually experience and see and feel what Jarrod experienced, I'm not sure you could all handle it. I know I couldn't***.

N.T., 7/14/17, at 157-58 (emphasis). At this point defense counsel objected, the trial court overruled it, and the prosecutor continued his closing.

- 19 -

In support of his claim that the trial court's failure to sustain his objection caused reversible error, Jordan contends "[t]he prosecutor's comment that he could not undergo what [Jarrod] herein did clearly was meant to have jury members place themselves in [Jarrod's] position and feel sympathy for him." *Id.* at 30. He further asserts his case is controlled by *Commonwealth v. Cherry*, 378 A.2d 800 (Pa. 1977), where our Supreme Court found reversible error when the prosecutor invoked the jury's sympathy to explain the inconsistencies in the witness/victim's testimony. According to Jordan, the prosecutor in his closing in this case, "attempted to explain away any inconsistencies in [Jarrod's testimony] by asking the jury members to put themselves in his shoes, and in so doing, wrongfully shifted the jurors' focus away from [Jordan's] guilt or innocence and replaced it with a plea to the jury that it consider what [Jarrod] allegedly underwent in this case." Jordan's Brief at 31.

Once again, we agree with the Commonwealth's assertion that Jordan did not adequately preserve this claim by making a motion for mistrial. *See Commonwealth v. Boring*, 684 A.2d 561, 568 (Pa. Super. 1996) (finding claims of prosecutorial misconduct are waived when a defendant's objection to a prosecutor's statement is granted, but no additional relief is requested).

Notwithstanding waiver, we agree with the following comments by the trial court:

> Here, the prosecutor's above-cited comments merely stress the indubitable point that hearing testimony about violent events in the courtroom setting is less alarming than

actually experiencing the events. Moreover, in this case, the jury watched the absolutely chilling video recording of Jarrod with the gun in his mouth while [Jordan] threatened to kill him. To the extent the prosecutor offered his opinion about whether he or the jurors could "handle" what Jarrod experienced, such trivial surplusage could not possibly have "fixed" in the jury a "bias and hostility towards the accused which would prevent them from properly weighing the evidence and rendering a true verdict."

Trial Court Opinion, 1/11/19, at 15-16 (citation omitted).

The above comments by the trial court readily indicate that the trial court would have denied Jordan's motion for mistrial had Jordan made one. Based on our review of the record, we cannot conclude that the trial court would have abused its discretion. *See Commonwealth v. Bryant*, 67 A.3d 716, 728 (Pa. 2013) (explaining an appellate court reviews the denial of a mistrial motion for an abuse of discretion).

Moreover, Jordan's reliance upon *Cherry* is misplaced. With the above comment, the prosecutor did not ask the jury to place themselves in Jarrod's shoes in order to invoke sympathy for him. Rather, as stated by the Commonwealth, "[t]he thrust of the prosecutor's statement was not to ask the jury to put itself in [Jarrod's] shoes, but to stress the idea that hearing testimony of nefarious events is less disturbing than seeing them unfold firsthand." Commonwealth's Brief at 21. In *Cherry*, our Supreme Court found reversible error occurred because the prosecutor attempted to explain away inconsistencies or gaps in the witness/victim's testimony by referencing her status as a victim of crime. *Cherry*, 378 A.2d at 804-05.

Here, by contrast, the prosecutor made no such representations. While the prosecutor's comment that neither he nor the members of the jury could "handle" what Jarrod experienced may have been unwise, under the facts of this case—a brief statement at the beginning of an otherwise lengthy closing— we cannot conclude that reversible error occurred. *See Commonwealth v. Clark*, 421 A.2d 374, 379, (Pa. Super. 1980), *affirmed*, 461 A.2d 794 (Pa. 1983) (distinguishing cases such as *Cherry*, *supra*, and holding that reversible error did not occur because the prosecutor's statements were of very limited duration and "were not part of an apparent attempt to focus the jury's attention on issues not before them or invite them to render an unreasoned verdict"); *see also Commonwealth v. Stafford*, 749 A.2d 489, 499 (Pa. Super. 2000) (citing *Clark*, *supra*, when rejecting Stafford's claim that the prosecutor violated "the 'Golden Rule' prohibition against asking the jury to put themselves in the place of a witness in order to inflame their passions").

Finally, we note that the prosecutor's comment did not prevent the jury from properly weighing the evidence and rendering a verdict, as it acquitted Jordan of the four most serious charges he was facing, and convicted him of only intimidation of a witness and a firearm violation. Sufficient evidence to support these verdicts came from the February 2016 video itself. As the trial court stated:

> The remarkable course of events over a nearly two (2) year period wherein [Jordan] terrorized [Jarrod] by threat of violence, and then carried through on those threats by

physically assaulting and threatening to kill him while shoving a gun in his mouth provided ample evidence upon which this jury convicted [Jordan.]

Trial Court Opinion, 1/11/19, at 16.

In sum, because each claim raised by Jordan is waived or otherwise meritless, we affirm his judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/8/19