J-A19006-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| SHYAM THAKKAR, M.D. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| ALLEGHENY CLINIC, ALLEGHENY | : | No. 1436 WDA 2024 |
| HEALTH NETWORK AND ACDH | : | |
| ENDOSCOPY II, LLC | : | |

Appeal from the Judgment Entered October 22, 2024
In the Court of Common Pleas of Allegheny County Civil Division at
No(s):  GD-21-001545

BEFORE:  BOWES, J., STABILE, J., and BENDER, P.J.E.

MEMORANDUM BY BENDER, P.J.E.:                **FILED: December 16, 2025**

Appellant, Shyam Thakkar, M.D., appeals from the judgment entered in favor of Appellees, Allegheny Clinic ("AC"), Allegheny Health Network ("AHN"), and ACDH Endoscopy II, LLC ("ACDH II"), following a non-jury trial.  We affirm.

## Background

The trial court found the following facts in pertinent part: Dr. Thakkar is an advanced therapeutic endoscopist gastroenterologist.  Findings of Fact and Conclusions of Law ("FFCL"), 6/10/24, at ¶ 1.  AC is a domestic nonprofit corporation that employs physicians and is a subsidiary of West Penn Allegheny Health System, Inc., whose member is AHN.  *Id.* at ¶ 2.  ACDH II is a Pennsylvania limited liability company comprised of physician-members who perform procedures at McCandless Endoscopy Center.  *Id.* at ¶ 3.  ACDH

II owns a 50% membership interest in McCandless Endoscopy Center, and Allegheny General Hospital ("AGH") owns the remaining 50% membership interest. *Id.*[1]

Beginning in 2008, AC employed Dr. Thakkar as an advanced therapeutic endoscopist gastroenterologist. *Id.* at ¶ 4. In September 2010, Dr. Thakkar became a 20% member of ACDH II. *Id.* at ¶ 5.[2] Dr. Thakkar performed procedures at McCandless Endoscopy Center. *Id.* On July 1, 2017, Dr. Thakkar entered into a Physician Employment Agreement with AC. *Id.* at ¶ 6. In relevant part, it provided:

> 5. <u>Term</u>. Unless terminated or renewed as hereinafter provided, the period of Physician's employment under this Agreement shall commence as of July 1, 2017 (the "**Commencement Date**"), and shall terminate on June 30, 2020 ("**Initial Term**"). Each twelve (12) month period beginning on the Commencement Date, and each twelve month period thereafter which begins with each anniversary date of the Commencement Date, will be referred to as a "Contract Year." Upon the expiration of the Initial Term and each applicable Renewal Term (hereinafter defined), this Agreement shall renew for additional successive one (1) year periods ("**Renewal Term**"), unless at least ninety days (90) prior to the expiration of the Initial Term or the applicable Renewal Term, as the case may be, either party shall have notified the other in writing that it does not intend to renew the Agreement or desires a modification to the terms and conditions of the Agreement. If there has been a timely notice received by one party from the other of an intent not to renew or a desire to modify a term or condition of the Agreement, and if the parties permit employment to continue beyond the above stated expiration date of the Initial Term or any subsequent Renewal Term without

---

[1] Testimony at trial indicated that AGH is an entity within AHN's network. *See* N.T., 11/27/23 & 11/30/23, at 165-66, 191, 200, 204-05.

[2] Dr. Thakkar testified that he became affiliated with ACDH II as part of his recruitment at AC. N.T. at 63.

mutually acceptable terms and conditions being agreed upon and reduced to writing, this Agreement shall be deemed extended on a month to month basis until such time as (i) the parties execute a legally binding document containing terms and conditions of or (ii) either party provides the other with written notice of termination. The Initial Term together with any Renewal Terms is referred to herein as the "**Term**".

Either party may terminate this agreement, with or without cause, by giving the other party one-hundred-eighty (180) days['] written notice.

Dr. Thakkar's Exhibit 1 ("Physician Employment Agreement") at ¶ 5; *see also* FFCL at ¶¶ 27-30.

On March 11, 2020, Jennifer Certo, Vice President of the Medicine Institute for AC and an employee of AHN, sent Dr. Thakkar a letter concerning his Physician Employment Agreement with AC. *Id.* at ¶ 34. It stated:

This letter serves as notice, pursuant to Section 5 of your Physician Employment Agreement with [AC] dated July 1, 2017 (the "Agreement"), that [AC] desires to modify the terms of the Agreement, effective July 1, 2020. We will present you with a new Physician Employment Agreement, to be effective July 1, 2020, that includes the modified terms.

In accordance with Section 5 of the Agreement, we have provided this letter to you more than 90 days prior to the expiration of the current renewal term of your Agreement (*i.e.*, June 30, 2020).

I will reach out to schedule a meeting to discuss your new Physician Employment Agreement and any questions that you may have regarding this communication.

AHN and AC's Exhibit F ("March 11, 2020 Letter"); *see also* FFCL at ¶¶ 35-37.

On May 15, 2020, Dr. Thakkar discussed the construction of his new contract with Ms. Certo, Diana Deweese, and Dr. Elie Aoun, the division chief of the gastroenterology division. FFCL at ¶ 58; *see also* N.T. at 75, 249. On

May 27, 2020, Ms. Certo emailed Dr. Thakkar stating that his compensation package was being sent out for a third-party fair market value review to finalize numbers and targets for the new contract. FFCL at ¶ 59. Between May 27 and June 10, 2020, various discussions about compensation, role positions, and metrics took place between Ms. Certo and Dr. Thakkar. *Id.* at ¶ 60. On June 11, 2020, AHN's chief medical officer, Dr. Don Whiting — who had reached out to Dr. Thakkar about an opportunity to become the chief outcomes officer in April 2020 — emailed Dr. Thakkar, stating, "[I]t is my understanding that your contract runs out at the end of the month. I will plan to start a search for a new [o]utcomes director on Monday because I don't want to get to the end of the month and not have a smooth transition from you." *Id.* at ¶ 61 (citation omitted); *see also* N.T. at 73-75. Dr. Thakkar replied that he "realize[d] the importance of having a contract in place." FFCL at ¶ 61 (citation omitted; brackets added by trial court). Later that day, Ms. Certo communicated to Dr. Thakkar that his compensation and other targets for the new contract met the standards of the market review process. *Id.* at ¶ 62.

On June 15, 2020, Dr. Thakkar provided a counteroffer to Ms. Certo's proposed new contract with a significant salary increase. *Id.* On this same day, Dr. Whiting responded to this email thread, stating, "[B]ecause you did not find ou[r] original offer acceptable[,] I must assume that you are declining the [outcomes] position and therefore I will move forward [to] find another person to fill the spot." *Id.* at ¶ 63 (citation omitted; some brackets added).

With the outcomes position withdrawn, Dr. Thakkar's new contract was required to be negotiated once again by Ms. Certo. *Id.* at ¶ 64. On June 18, 2020, Ms. Certo, Dr. Aoun, and Dr. Thakkar met to discuss Dr. Thakkar's counteroffer. *Id.* at ¶ 65. On June 19, 2020, Dr. Thakkar emailed these parties stating his understanding that his current agreement would continue month-to-month until a new contract was reached. *Id.* Ms. Certo responded to his email the same day, writing:

> Attached please find an updated term sheet for your review. As noted in the term sheet, we expect that you will review and respond to us no later than close of business on June 26, 2020. The offer set forth in the attached term sheet will expire at that time.
>
> We respectfully disagree with the statement below that your contract will continue on a month-to-month basis after July 1, 2020. It is AC's view that AC has been engaged in good faith negotiations with you throughout a 90-day notice period and has presented you with an offer that you rejected. Your contract is extended on a month-to-month basis only if the parties permit employment to continue beyond the expiration date without mutually acceptable terms and conditions being agreed upon and reduced to writing. At this point, AC does not plan to permit employment to continue beyond the contract's June 30, 2020 expiration date without mutually acceptable terms.

AHN and AC's Exhibit I ("Ms. Certo's June 19, 2020 email"); *see also* FFCL at ¶ 66.

On June 30, 2020, with no new contract in place and no approval from AC that negotiations would continue on a month-to-month basis beyond the Physician Employment Agreement's set expiration date, Dr. Thakkar's agreement ended and he was terminated. FFCL at ¶ 71. Dr. Thakkar's clinical credential privileges and his malpractice insurance through AC were

terminated effective June 30, 2020, and never reinstated. *Id.* at ¶ 110. Because Dr. Thakkar no longer had privileges or malpractice insurance, he ceased performing procedures at McCandless Endoscopy Center beginning on June 30, 2020. *Id.* at ¶ 111.

On September 8, 2020, Dr. Thakkar proposed to ACDH II's members the sale of his membership units to another physician, which required certain approval from the other members. *Id.* at ¶ 12. All of ACDH II's eligible members voted against the sale of Dr. Thakkar's membership units to the suggested physician. *Id.*

On September 11, 2020, ACDH II notified Dr. Thakkar that he was no longer a member in "good standing" under the terms of the ACDH II Operating Agreement and that his ownership in ACDH II would be terminated as of September 15, 2020. *Id.* at ¶ 13. ACDH II enclosed a $25,000 check to Dr. Thakkar for the full purchase price of his interest in ACDH II. *Id.*

On February 24, 2021, Dr. Thakkar filed a three-count complaint against AHN, AC, and ACDH II. Count I alleged breach of contract-violation of the Wage Payment and Collection Law ("WPCL"), 43 P.S. § 260.1 *et seq.*, against AHN; Count II alleged breach of contract against AHN and ACDH II; and Count III sought a declaratory judgment.[3] Following the filing of preliminary

---

[3] Although Dr. Thakkar originally brought Count I against AHN only, and Count II against AHN and ACDH II only, the complaint was later amended to reflect that Dr. Thakkar was "not only proceeding against [AHN], … but also against [AC]…." N.T. at 293. *See also id.* at 291 (Dr. Thakkar's explaining that he
*(Footnote Continued Next Page)*

objections, the trial court sustained AHN and AC's preliminary objections as to Dr. Thakkar's declaratory judgment claim in Count III. *See* Order, 6/23/21. With respect to Counts I and II, the case proceeded to a non-jury trial on November 27 and 30, 2023.

At the non-jury trial, with respect to Count I, Dr. Thakkar contended that AC violated the WPCL by breaching the Physician Employment Agreement when it failed to provide him with the contractually required 180-day notice to terminate the agreement. *See* FFCL at ¶ 38. Further, to the extent AC and AHN were separate entities, he averred that AC provided no notice at all, as notice by AHN cannot be deemed notice by AC. *See id.* at ¶ 39. In Count II, Dr. Thakkar advanced that ACDH II materially breached the ACDH II Operating Agreement at the direction of AHN by precluding Dr. Thakkar from performing procedures after June 30, 2020. *See id.* at ¶ 106. He also asserted that he is owed the fair market value for his 20% membership interest in ACDH II, as well as unpaid capital distributions and unpaid amounts from a partner capital account. *See id.* at ¶ 108.

Following the non-jury trial, on June 10, 2024, the trial court entered a verdict in favor of Appellees on all counts. Regarding Count I, it determined, *inter alia*, that AC provided Dr. Thakkar with proper notice that the Physician

---

was proceeding "based on the fact that [AHN] has the fictious name [AC]. But in light of what you presented and the evidence, we'd like to make sure that we're clear. You did plead in your Answer to our Complaint identifying the parties that [AC] was a separate nonprofit corporation. We want to just make it clear that we're conforming and will accept both of those in the alternative[.]").

Employment Agreement would terminate on June 30, 2020, and that AC manifested in Ms. Certo the authority to negotiate physician contracts on its behalf. *See id.* at ¶¶ 40, 77. As for Count II, the trial court ascertained that Dr. Thakkar "failed to maintain Good Standing under section 6.1(iii) of the ACDH II Operating Agreement[,] as [Dr. Thakkar] ceased to perform procedures at the McCandless Endoscopy Center and failed to establish that he could have performed these procedures without clinical privileges." *Id.* at ¶ 148. The trial court also concluded that "ACDH II had the right to repurchase [Dr. Thakkar's] membership units for an amount equal to his total capital contributions — $25,000[,]" and that he is entitled to no other damages or distributions from ACDH II. *Id.* at ¶¶ 158, 159-64.

On June 20, 2024, Dr. Thakkar filed a timely post-trial motion. The trial court did not rule on it. On October 22, 2024, ACDH II filed a praecipe for judgment.[4] On November 18, 2024, Dr. Thakkar filed a timely notice of appeal. The trial court did not order him to file a concise statement pursuant to Pa.R.A.P. 1925(b).[5]

_____

[4] *See* Pa.R.Civ.P. 227.4(1)(b) ("[T]he prothonotary shall, upon praecipe of a party … enter judgment upon … the decision of a judge following a trial without jury, if … one or more timely post-trial motions are filed and the court does not enter an order disposing of all motions within one hundred twenty days after the filing of the first motion. A judgment entered pursuant to this subparagraph shall be final as to all parties and all issues and shall not be subject to reconsideration[.]").

[5] The trial court did not issue a Rule 1925(a) opinion. However, the reasons for its decision are apparent from its June 10, 2024 Findings of Fact and Conclusions of Law.

**Issues**

On appeal, Dr. Thakkar raises the following issues for our review:

I. Whether the trial court erred or abused its discretion by finding that the letter from Jennifer Certo, an AHN employee, dated March 11, 2020, constituted proper notice of "modification" of the 2017 contract on behalf of AC, the alleged principal of AHN?

A. Whether the trial court erred or abused its discretion by entering verdict in [Appellees'] favor on all counts finding that Dr. Thakkar was only entitled to ninety (90) days' notice that AC desired a so-called "modification" of the 2017 contract?

B. Whether the trial court erred or abused its discretion in failing to find that Dr. Thakkar was entitled to one-hundred-eighty (180) days' notice that AC terminated the 2017 contract, and, that, accordingly, AC breached the 180 days' notice of termination provision of the 2017 contract?

II. Whether the trial court erred or abused its discretion by finding that Dr. Thakkar was not entitled to any damages under the WPCL contrary to ***Shaer v. Orthopaedic Surgeons of Central PA, Ltd.***, 938 A.2d 457 (Pa. Super. … 2007)?

A. Whether the trial court erred or abused its discretion by failing to award liquidated damages to Dr. Thakkar regarding the WPCL claim despite the absence of a finding of a good faith dispute between the parties by clear and convincing evidence?

B. Whether the trial court erred or abused its discretion by failing to find that Dr. Thakkar owed no duty to mitigate damages regarding the WPCL claim?

C. Whether the trial court erred or abused its discretion by refusing to award attorneys' fees and expert fees to Dr. Thakkar regarding the WPCL claim?

III. Whether the trial court erred or abused its discretion by failing to return a verdict in Dr. Thakkar's favor finding that ACDH II breached the operating agreement at AHN's direction?

A. Whether the trial court erred or abused its discretion by finding that Dr. Thakkar was not a member in good standing

- 9 -

of ACDH II because Dr. Thakkar allegedly "cease[d] to perform medical procedures at the facility"?

B. Whether the trial court erred or abused its discretion by failing to find that Dr. Thakkar is owed the fair market value for his 20% membership interest in ACDH II as well as unpaid capital distributions and unpaid amounts from a partner capital account?

C. Whether the trial court erred or abused its discretion by finding that the remaining members of ACDH II have the right to purchase Dr. Thakkar's shares for an amount equal to Dr. Thakkar's capital contributions, namely $25,000?

IV. Whether the Court should remand the action to the trial court for further proceedings regarding the damages that [Appellees'] breaches have caused?

Dr. Thakkar's Brief at 4-7 (unnecessary capitalization and emphasis omitted).

## Standard and Scope of Review

At the outset, we acknowledge that:

Our standard of review in non-jury trials is to assess whether the findings of facts by the trial court are supported by the record and whether the trial court erred in applying the law. Upon appellate review, the appellate court must consider the evidence in the light most favorable to the verdict winner and reverse the trial court only where the findings are not supported by the evidence of record or are based on an error of law. Our scope of review regarding questions of law is plenary.

***Riverview Carpet & Flooring, Inc. v. Presbyterian SeniorCare***, 299 A.3d 937, 956 (Pa. Super. 2023) (cleaned up).

## Analysis

### *First Issue*

In Dr. Thakkar's first issue, he argues that AC provided no notice of termination of the Physician Employment Agreement. Dr. Thakkar's Brief at 27. He claims that the trial court "incorrectly applied the law in finding that

AHN acted as AC's agent in providing notice of 'modification' of the [Physician Employment Agreement] to Dr. Thakkar." *Id.* at 28. He states that "notice by Ms. Certo, an AHN employee, does not constitute notice by AC because AC never made any statements or other manifestations that AHN or Ms. Certo was acting on its behalf in providing notice of 'modification' to Dr. Thakkar." *Id.* (citation omitted). He says that "only AC, as the party to the [Physician Employment Agreement], could provide notice of termination of the [Physician Employment Agreement], and, because AC failed to do so, AC breached [the Physician Employment Agreement]." *Id.* at 31.

Dr. Thakkar also argues that, assuming *arguendo* that notice by AHN constituted notice by AC, the trial court erred or abused its discretion in finding that the 90-day notice provision applied, instead of the 180-day provision. *Id.* He insists that "[t]he 180-day notice of termination and the 90-day provision are separate provisions addressing separate matters." *Id.* at 33. He claims that "the 90-day provision applies in the context of modification and non-renewal as opposed to termination." *Id.* at 33-34.

> No relief is due. Initially,
>
> [t]he basic elements of agency are the manifestation by the principal that the agent shall act for him, the agent's acceptance of the undertaking and the understanding of the parties that the principal is to be in control of the undertaking. The creation of an agency relationship requires no special formalities. The existence of an agency relationship is a question of fact. The party asserting the existence of an agency relationship bears the burden of proving it by a fair preponderance of the evidence. In establishing agency, one need not furnish direct proof of specific authority, provided it can be inferred from the facts that at least an implied intention to create the relationship of principal and agent existed.

- 11 -

However, we do not assume agency by a mere showing that one person does an act for another.

**Walton v. Johnson**, 66 A.3d 782, 787 (Pa. Super. 2013) (cleaned up).

Here, the trial court found that "AC is a subsidiary of West Penn Health System, of which AHN is a member." FFCL at ¶ 80 (citation omitted). It determined that Ms. Certo is the Vice President of the Medicine Institute for AC and an employee of AHN. **Id.** at ¶ 34. It stated that, "[a]lthough [Ms.] Certo is an employee of AHN, it is clear from the facts of this case that AC, the principal at hand, manifested long ago in [Ms.] Certo the authority to negotiate these physician contracts on behalf of AC." **Id.** at ¶ 77. It noted that Ms. Certo has held the role of Vice President of the Medicine Institute for AC since 2020, during which time she has negotiated physician contracts on behalf of AC; she has financial, operational, and strategic responsibilities in her role at AC's Medicine Institute; and her role involves extensive contracting for all new physicians in the Medicine Institute as well as any amendments or changes to their contracts or renewals. **Id.** at ¶¶ 81-84; **see also** N.T. at 220 (Ms. Certo's stating that she has been the vice president of the Medicine Institute at AC since January 2020). The trial court observed that, when Ms. Certo sent Dr. Thakkar the March 11, 2020 letter notifying him that AC desired to modify his Physician Employment Agreement, Ms. Certo sent it "under her role as Vice President of the Medicine Institute for [AC] and on behalf of [AC]." **Id.** at ¶ 85 (citation omitted). From these facts, the trial court concluded that "it is clear … that [Ms.] Certo did not manifest in herself the authority to negotiate these contracts. Rather, the principal, AC, manifested in [Ms.] Certo

- 12 -

this authority to contract on its behalf." *Id.* at ¶ 86. As such, it ascertained that "the March 11, 2020 letter from [Ms.] Certo on behalf of AC constitutes proper notice to [Dr. Thakkar] that AC desired to modify the terms of his [a]greement." *Id.* at ¶ 88.

The record supports the trial court's findings. *See* N.T. at 219-25, 228-30 (Ms. Certo's describing her role as the Vice President of the Medicine Institute for AC and the March 11, 2020 letter); March 11, 2020 Letter at 1 (conveying that "[AC] desires to modify the terms of the Agreement"); *see also Riverview Carpet & Flooring, Inc.*, *supra* ("Upon appellate review, the appellate court must consider **the evidence in the light most favorable to the verdict winner** and reverse the trial court only where the findings are not supported by the evidence of record or are based on an error of law.") (emphasis added).[6] Further, as AHN and AC point out, Dr. Thakkar agreed that, when he received the March 11, 2020 letter from Ms. Certo, he knew that **AC** would provide him with a new Physician Employment Agreement. N.T. at 113; *see also* N.T. at 72 (Dr. Thakkar's stating that the March 11, 2020 letter "came from [AHN], Jennifer Certo, and as I understood it, on behalf of [AC]"). Accordingly, we reject Dr. Thakkar's claim that AC failed to provide notice of termination of the Physician Employment Agreement.

---

[6] To the extent Dr. Thakkar argues that Ms. Certo could not act as an agent for AC because she was not employed by AC, but rather AHN, he provides no legal authority to support that an agent must be an employee of the principal. *See Commonwealth v. Wilson*, 147 A.3d 7, 15 (Pa. Super. 2016) ("Where an appellant offers no citation to pertinent case law or other authority in support of an argument, the claim is waived.") (citation omitted).

With respect to the trial court's finding that the 90-day notice provision applies, we likewise find no error. We recognize:

> The fundamental rule in interpreting the meaning of a contract is to ascertain and give effect to the intent of the contracting parties. The intent of the parties to a written agreement is to be regarded as being embodied in the writing itself. The whole instrument must be taken together in arriving at contractual intent. Courts do not assume that a contract's language was chosen carelessly, nor do they assume that the parties were ignorant of the meaning of the language they employed. When a writing is clear and unequivocal, its meaning must be determined by its contents alone.
>
> Only where a contract's language is ambiguous may extrinsic or parol evidence be considered to determine the intent of the parties. A contract contains an ambiguity if it is reasonably susceptible of different constructions and capable of being understood in more than one sense. This question, however, is not resolved in a vacuum. Instead, contractual terms are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts. In the absence of an ambiguity, the plain meaning of the agreement will be enforced. The meaning of an unambiguous written instrument presents a question of law for resolution by the court.

*Murphy v. Duquesne Univ. of the Holy Ghost*, 777 A.2d 418, 429-30 (Pa. Super. 2001) (cleaned up).

As set forth *supra*, the Physician Employment Agreement provided:

> 5. <u>Term</u>. Unless terminated or renewed as hereinafter provided, the period of Physician's employment under this Agreement shall commence as of July 1, 2017 (the "**Commencement Date**"), and shall terminate on June 30, 2020 ("**Initial Term**"). Each twelve (12) month period beginning on the Commencement Date, and each twelve month period thereafter which begins with each anniversary date of the Commencement Date, will be referred to as a "Contract Year." Upon the expiration of the Initial Term and each applicable Renewal Term (hereinafter defined), this Agreement shall renew for additional successive one (1) year periods ("**Renewal Term**"), unless at least ninety days (90) prior to the expiration of the Initial Term or the applicable Renewal

Term, as the case may be, either party shall have notified the other in writing that it does not intend to renew the Agreement or desires a modification to the terms and conditions of the Agreement. If there has been a timely notice received by one party from the other of an intent not to renew or a desire to modify a term or condition of the Agreement, and if the parties permit employment to continue beyond the above stated expiration date of the Initial Term or any subsequent Renewal Term without mutually acceptable terms and conditions being agreed upon and reduced to writing, this Agreement shall be deemed extended on a month to month basis until such time as (i) the parties execute a legally binding document containing terms and conditions of or (ii) either party provides the other with written notice of termination. The Initial Term together with any Renewal Terms is referred to herein as the "**Term**".

Either party may terminate this agreement, with or without cause, by giving the other party one-hundred-eighty (180) days written notice.

Physician Employment Agreement at ¶ 5.

We conclude that the 90-day notice provision applies. The trial court found that, on March 11, 2020, Ms. Certo notified Dr. Thakkar that AC desired to modify his agreement. FFCL at ¶ 85. It determined that the events occurring after the March 11, 2020 letter are "indicative of a negotiation that failed to come to fruition." *Id.* at ¶ 57. It discerned that, after Dr. Thakkar stated that he thought his current agreement would continue on a month-to-month basis until a new contract was reached, Ms. Certo told him that "AC does not plan to permit employment to continue beyond the contract's June 30, 2020 expiration date without mutually acceptable terms." *Id.* at ¶ 66 (quoting Ms. Certo's June 19, 2020 email, *supra*). The record supports these findings. *See* N.T. at 72, 112 (Dr. Thakkar's stating that he received notice to modify the terms on March 11, 2020); *id.* at 242-69 (Ms. Certo's discussing

- 15 -

the negotiations that occurred); *id.* at 247 (Ms. Certo's stating that she did not tell Dr. Thakkar that he could be employed on a month-to-month basis after June 30, 2020); *id.* at 269 (Ms. Certo's relaying that she emailed Dr. Thakkar and advised him that AC does not plan to permit his employment to continue beyond the contract's June 30, 2020 expiration date without mutually acceptable terms); *see also Riverview Carpet & Flooring, Inc.*, *supra*. As AHN and AC aptly explain,

> Dr. Thakkar's insistence on receiving 180-days' notice would force this Court to improperly strike the 90-day provision from the contract and render it meaningless. Otherwise, a 90-day notice of nonrenewal or modification and the ensuing scenarios explained in Section 5 of the Physician [Employment] Agreement would have no meaning.
>
> [T]he notice provisions must be read together and construed so that every term is given meaning. Here, once the 90-day notice of modification was triggered by [AC], the [t]erm of the Physician [Employment] Agreement **would end** on June 30, 2020, **unless** the parties reached mutually agreeable terms, or **both parties** permitted the contract to continue from month-to-month until mutual terms were reached or written notice of termination was provided. Because the parties did not reach mutually agreeable terms and did not permit employment to continue beyond June 30, 2020, Dr. Thakkar's employment ended on that date with no further action required by [AC].
>
> … Dr. Thakkar's argument that notice of 180 days **must** be given **any** time a party wishes to terminate the Agreement plainly ignores … the 90-day notice period at issue here.

AHN and AC's Brief at 23-25 (citations and footnote omitted; emphasis in original). We agree with AHN and AC's analysis. Given the facts of this case, the 180-day provision was inapplicable. As such, no relief is warranted on Dr. Thakkar's first issue.

*Second Issue*

In Dr. Thakkar's second issue, he argues that "the trial court erred or abused its discretion by finding that Dr. Thakkar was not entitled to any damages under the WPCL where AC and AHN breached the [Physician Employment Agreement]." Dr. Thakkar's Brief at 34 (unnecessary emphasis and capitalization omitted). This issue likewise fails.

"[T]he WPCL provides employees a statutory remedy to recover wages and other benefits that are contractually due to them." **Braun v. Wal-Mart Stores, Inc.**, 24 A.3d 875, 953 (Pa. Super. 2011) (cleaned up). "The WPCL does not create a statutory right to compensation. Rather, it provides a statutory remedy when the employer breaches a contractual right to earned wages. Whether specific wages are due is determined by the terms of the contract." **Id.** at 957 (citations omitted).

We have already ascertained that Dr. Thakkar has not shown that AC or AHN breached the Physician Employment Agreement. Accordingly, Dr. Thakkar's WPCL claim also fails.

*Third Issue*

In Dr. Thakkar's third issue, he advances that the trial court erred and abused its discretion in failing to find that ACDH II materially breached the ACDH II Operating Agreement at AHN's direction. Dr. Thakkar's Brief at 42. He complains that the trial court found that he was not a member in good standing because he ceased to perform procedures at the facility, noting that Dr. Thakkar had lost his clinical privileges and medical malpractice insurance.

*See id.* at 43. Contrary to the trial court's findings, however, Dr. Thakkar says he ceased to perform procedures only because ACDH II did not allow him access to the McCandless Endoscopy Center. *Id.* He insists that he "has always been ready, willing, and able to perform medical procedures[,]" and asserts that the ACDH II Operating Agreement "is silent as to what timeframe would even constitute a 'ceasing' of procedures." *Id.* at 44 (citations omitted). He maintains that he "had the ability to secure malpractice insurance once he booked patients, which AHN precluded even though AHN did not control the facility." *Id.* (citation omitted). Further, he claims that "a doctor need not have AHN clinical privileges to perform procedures at McCandless Endoscopy Center[,]" and avers that "there is no requirement for maintaining such privileges in the [ACDH II] Operating Agreement if a doctor's privileges are revoked for non-disciplinary reasons like Dr. Thakkar's were." *Id.* (citations omitted).

No relief is due. Section 6.4 of the ACDH II Operating Agreement provides:

> 6.4[.] <u>Failure of Member to Maintain Good Standing</u>. Any Member who fails to remain in "Good Standing" shall, if requested by the Company, sell, assign, and convey such Member's Units to the Company and the Company shall purchase such Member's Units for the purchase price and other provisions described in 6.1. For purposes of this Agreement, a Member fails to remain in Good Standing upon the happening of any one of more of the following events:
>
> ***
>
> (iii) The physician Member ceases to perform medical procedures at the Facility….

Dr. Thakkar's Exhibit 3 ("ACDH II Operating Agreement") at 6.4(iii).

Here, the trial court found that Dr. Thakkar ceased performing medical procedures at the facility. It ascertained that Dr. Thakkar's "personal ability and willingness to perform procedures at the facility and [Dr. Thakkar's] ability to obtain the proper privileges which would allow him to perform procedures at the facility are distinctly different." FFCL at ¶ 134. It determined that, upon learning that his malpractice insurance was cancelled by AC effective June 30, 2020, Dr. Thakkar arranged for, but never purchased, his own malpractice coverage. *Id.* at ¶ 139. Furthermore, it discerned that Dr. Thakkar never reapplied for privileges after his employment was terminated, even though he was aware that he could reapply for such privileges on his own. *Id.* at ¶ 140. It observed that, although Dr. Thakkar testified that physicians do not have to be employed by AHN or AC to perform procedures at McCandless Endoscopy Center, Dr. Thakkar presented no evidence to support that physicians may perform procedures at the McCandless Endoscopy Center without AHN clinical privileges. *Id.* at ¶ 141. Similarly, it conveyed that Alex Byers, CEO of MSI Healthcare Inc. and an administrator of McCandless Endoscopy Center, testified that independent physicians work at McCandless Endoscopy Center that are not employed by AHN or AC; however, Mr. Byers presented no evidence to support an assertion that physicians may perform procedures there without AHN privileges. *Id.* at ¶ 142. In addition, the trial court noted that, on January 23, 2023, it issued an order deeming admitted by Dr. Thakkar the request for admission by ACDH II, which stated:

"Admit that, in order to remain in 'good standing' under the ACDH II Operating Agreement, [Dr.] Thakkar was required to maintain medical staff and clinical privileges at AHN facilities." *Id.* at ¶ 143. It explained that, for Dr. Thakkar to prevail on his argument that ACDH II prevented him from performing procedures at the facility, he had to show that he actually *could* perform these procedures without AHN clinical privileges, which he failed to do. *Id.* at ¶¶ 145-46.

Dr. Thakkar does not convince us that the trial court erred and/or abused its discretion, as the two arguments Dr. Thakkar advances in response to the trial court's assertion that he had to show he could perform procedures without AHN clinical privileges are uncompelling. First, Dr. Thakkar insists that he testified that a doctor need not have AHN clinical privileges to perform procedures at McCandless Endoscopy Center, but the only testimony he cites in support in his argument is inapposite. Dr. Thakkar's Brief at 44 (citing N.T. at 92:14-25, 93:14-24). There, Dr. Thakkar testified:

> [Dr. Thakkar's attorney:] Just to clarify just so I understand, again. You testified earlier, I believe, but let me ask again. There are independent providers that are performing procedures at McCandless Endoscopy; is that correct?
>
> [Dr. Thakkar:] Yes. At least as of June 2020, Mr. Michael Mlecko was there, Dr. Michele Victain, Dr. Andrew Thomas. These were all independent providers that were performing endoscopic procedures at McCandless Endoscopy Center.
>
> [Dr. Thakkar's attorney:] And they would have their own malpractice insurance presumably?
>
> [Dr. Thakkar:] That's right. Through their practice.
>
> ***

> [Dr. Thakkar's attorney:] Do you have to be employed by [AHN] or [AC] to have credentials to perform in their facility?
>
> [Dr. Thakkar:] No.  In fact, you know, at [AGH], we had individuals in the past that were private practitioners, but they slowly moved over to West Penn.  And it was predominately the employed physicians at [AGH].  But at West Penn Hospital and at Forbes Regional Hospital, we had private practitioners come in and use the facility and admit and consult on patients.

N.T. at 92, 93.

This testimony does not state that a practitioner does not need to have AHN clinical privileges to perform procedures at McCandless Endoscopy Center.  Instead, it conveys that (1) there are independent providers that perform procedures at McCandless Endoscopy Center without making any mention of what privileges and credentials those independent providers have, and that (2) physicians do not have to be **employed** at AHN or AC **to have credentials** to perform at one of their facilities.

Second, Dr. Thakkar argues that the ACDH II Operating Agreement did not require that he maintain AHN clinical privileges.  However, even if the ACDH II Operating Agreement did not require that he maintain AHN clinical privileges, Dr. Thakkar still fails to show that he could have performed procedures at the McCandless Endoscopy Center without AHN clinical privileges.  When asked if there were doctors performing procedures at McCandless Endoscopy Center that did not have privileges at AHN facilities, Dr. Thakkar answered, "I don't know."  N.T. at 169.  Further, when Mr. Byers was asked if individuals who provide services and procedures at McCandless Endoscopy Center have privileges at AHN facilities, he responded, "I believe

they do. But I'm not sure." *Id.* at 202-03. When questioned if a physician would be able to provide services at an ambulatory center owned 50% by a hospital system without having privileges at a hospital, Mr. Byers responded, "Generally, for continuity of care, it's required by hospitals and surgery centers that the physicians are on the staffs [of the hospital]." *Id.* at 203. Further, Dr. Thakkar agreed that he could have reapplied for privileges and credentialing on his own after the agreement expired, but that he did not do so. *See id.* at 149-50.

Moreover, Dr. Thakkar does not address the trial court's assertion that it deemed admitted by Dr. Thakkar that he was *required* to maintain medical staff and clinical privileges at AHN facilities to remain in 'good standing' under the ACDH II Operating Agreement. FFCL at ¶ 143. We will not develop an argument on his behalf as to why he should not be bound by this admission. *See Commonwealth v. Rush*, 959 A.2d 945, 950-51 (Pa. Super. 2008) ("It [is] not for this Court to develop an appellant's arguments. Rather, it is the appellant's obligation to present developed arguments and, in so doing, apply the relevant law to the facts of the case, persuade us there were errors, and convince us relief is due because of those errors. If an appellant fails to do so, we may find the argument waived.") (citations omitted). Accordingly, based on his arguments, Dr. Thakkar has not convinced us that the trial court erred or abused its discretion in determining that he ceased performing procedures at McCandless Endoscopy Center.

Next, Dr. Thakkar claims that the trial court erred or abused its discretion by failing to find that he is owed the fair market value for his 20% ownership interest in ACDH II, as well as unpaid capital distributions and unpaid amounts from a partner capital account. Dr. Thakkar's Brief at 45. He contends that Section 6.1 of the ACDH II Operating Agreement provides that a fair market value assessment must be performed, and that Section 6.1(C) sets forth that notice must be provided for any transfer of shares back to ACDH II. *Id.* He also says his capital account was "zeroed out[,]" and claims that his Schedule K-1 tax form "indicates distributions and withdrawals of $81,120; however, he was only provided $51,000 in distributions." *Id.* (citation omitted). Moreover, he claims that, because there was no involuntary withdrawal by him, ACDH II was not entitled to forcibly acquire his shares. *Id.* at 46.

In determining that Dr. Thakkar was due $25,000, the trial court explained that the failure by a physician member to remain in good standing under the terms of the ACDH II Operating Agreement entitles the remaining members to purchase that member's interest. FFCL at ¶¶ 149-50; *see also* ACDH II Operating Agreement at 6.4, *supra* ("Any Member who fails to remain in 'Good Standing' shall, if requested by the Company, sell, assign, and convey such Member's Units to the Company and the Company shall purchase such Member's units for the purchase price and other provisions described in 6.1."). Section 6.1(B) of the ACDH II Operating Agreement states:

B.  The purchase price for a Member's/Interest Holder's entire interest in the Company shall be the lesser of (i) the sum of (a) the initial Capital Contribution, (b) all additional Capital Contributions, and (c) amounts paid to purchase another Member's/Interest Holder's Interest when the Company could not purchase such Interest, made by the Member/Interest Holder, or (ii) the Fair Market Value of the Units owned by the Interest Holder; provided, however, if a Member (or Interest Holder) is in default, the purchase price for his or her Units/Interest will be reduced by fifty percent (50%).

ACDH II Operating Agreement at 6.1(B); *see also* FFCL at ¶ 151 (discussing Section 6.1).  Based on Section 6.1(B), the trial court determined that the remaining ACDH II members were entitled to purchase Dr. Thakkar's interest for the lesser of the fair market value of his interest or the aggregate capital contributions he made.  FFCL at ¶ 153.  Despite bearing the burden of proof, the trial court said that Dr. Thakkar failed to demonstrate evidence of the fair market value of his interest in ACDH II.  *Id.* at ¶ 155.  It found that the aggregate capital contributions made by Dr. Thakkar to ACDH II totaled $25,000, which ACDH II paid to him in September 2020.  *Id.* at ¶¶ 155-56.  As for other distributions, the trial court noted that Dr. Thakkar failed to show a breach of contract, and that Dr. Thakkar was issued a distribution in 2020 for $51,000, an amount equal to all other similarly situated members at ACDH II.  *Id.* at ¶¶ 161-63.

Dr. Thakkar again fails to demonstrate that the trial court erred and/or abused its discretion.  To begin, he baldly states that Section 6.1 of the ACDH II Operating Agreement requires that a fair market value assessment be performed.  However, we deem this argument waived, as he provides no

further elaboration on why a fair market value assessment was required, and how the lack of any such assessment caused him damage, particularly where Section 6.1(B) sets forth that the purchase price of Dr. Thakkar's interest shall be the **lesser** of either Dr. Thakkar's aggregate capital contributions or the fair market value of the units owned by him.  **Spang & Co. v. U.S. Steel Corp.**, 545 A.2d 861, 866 (Pa. 1988) ("[T]he plaintiff in an action for breach of contract has the burden of proving damages resulting from the breach.") (citations omitted); **Discover Bank v. Booker**, 259 A.3d 493, 495 (Pa. Super. 2021) ("Three elements are necessary to plead properly a cause of action for breach of contract: (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages.") (cleaned up); **see also Rush**, **supra**.[7]  No relief is due.

As for notice, Dr. Thakkar's entire argument is that "Section 6.1(C) provides that notice must be provided for any transfer of shares back to the company[,]" and that the ACDH II Operating Agreement "requires notice be provided as to the date and timing of the transfer of shares after a valuation is performed."  Dr. Thakkar's Brief at 45, 46.  Dr. Thakkar does not specifically

---

[7] Dr. Thakkar asserts that his expert "calculated a range of Dr. Thakkar's share of the fair market value of the McCandless Endoscopy Center as of February 2020 at up to $772,000."  Dr. Thakkar's Reply Brief at 8 (citations omitted). Even if the $772,000 value argued by Dr. Thakkar was accepted *arguendo*, Dr. Thakkar still has not shown that he would be entitled to more than the $25,000 in aggregate capital contributions pursuant to Section 6.1(B) of the ACDH II Operating Agreement.  **See** ACDH II Operating Agreement at 6.1(B) (stating that the purchase price shall be the lesser of the fair market value of the member's interest or the aggregate capital contributions made).

discuss Section 6.1(C) and how it applies to the facts of this case, nor does he explain how any lack of notice caused him damage. *See Spang & Co.*, *supra*; *Discover Bank*, *supra*. Again, we will not craft arguments on Dr. Thakkar's behalf, and this issue is waived. *See Rush*, *supra*.

Dr. Thakkar's argument that ACDH II further breached the ACDH II Operating Agreement by not providing him with unpaid capital distributions and unpaid amounts from a partner capital account likewise fails. Dr. Thakkar develops no meaningful argument explaining how ACDH II breached the ACDH II Operating Agreement in this regard, as he points to no provision of the ACDH II Operating Agreement to support that these items were owed to him. Instead, Dr. Thakkar baldly claims that they are owed to him. *See* Dr. Thakkar's Brief at 45-46. We reiterate that it is not for this Court to develop arguments for an appellant; we deem this issue waived. *See Rush*, *supra*.

Finally, with respect to Dr. Thakkar's claim that ACDH II is not entitled to forcibly acquire his shares in the absence of an involuntary withdrawal, he does not address the language in Section 6.4 stating that "[a]ny Member who fails to remain in 'Good Standing' *shall*, if requested by the Company, sell, assign, and convey such Member's Units to the Company and the Company *shall* purchase such Member's Units for the purchase price and other provisions described in Section 6.1." ACDH II Operating Agreement at 6.4 (emphasis added). As such, we are unpersuaded by his argument that ACDH II could not acquire his shares. Accordingly, Dr. Thakkar's third issue warrants no relief.

- 26 -

*Fourth Issue*

In Dr. Thakkar's fourth issue, he says that — upon reversal of the trial court's judgment — this Court should remand this action to the trial court for further proceedings regarding damages suffered by Dr. Thakkar because of Appellees' breaches.  Dr. Thakkar's Brief at 46.  As we have ascertained that Dr. Thakkar's issues are meritless, no remand is necessary.

Judgment affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 12/16/2025